# Exhibit F

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DIEP X. HOANG, | ) | |
| | ) | No.: 03 C 2910 |
| Plaintiff, | ) | |
| | ) | Judge Paul E. Plunkett |
| vs. | ) | Magistrate Judge Schenkier |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| KATHERINE GREEN, KENNETH A. WILSON, | ) | |
| and MAURIZO ACQUASALIENTE, | ) | |
| Defendants. | ) | |

## NOTICE OF FILING

To:    Hubert O. Thompson
       Ronald Austin, Jr.
       Brothers & Thompson, P.C.
       100 West Monroe Street, Suite 1700
       Chicago, Illinois  60603

**PLEASE TAKE NOTICE**, on **Friday, March 18, 2005**, I caused to be filed by hand delivery with the United States District Court for the Northern District of Illinois, the **PLAINTIFF'S FOURTH AMENDED COMPLAINT**, a copy of which is attached and is hereby served upon you.

Dated: March 18, 2005

                                    **DIEP X. HOANG**

                        By:   _Julie A. Govreau_
                              Julie A. Govreau

ANDREWS KOEHLER & PASSARELLI, P.C.
4343 Commerce Court, Suite 615
Lisle, Illinois  60532
(630) 505-9939 (Telephone)
(630) 505-9969 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that she served a true and correct copy of Plaintiff's **NOTICE OF FILING** upon the below-noticed individual(s) via U.S. Mail, first class postage prepaid on this 18th day of March, 2005.

Hubert O. Thompson
Ronald Austin, Jr.
Brothers & Thompson, P.C.
100 West Monroe Street, Suite 1700
Chicago, Illinois 60603

_Julie A. Govreau_
Julie A. Govreau

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DIEP X. HOANG, | ) | |
| | ) | |
| Plaintiff, | ) | No.: 03 C 2910 |
| | ) | |
| | ) | Judge Paul E. Plunkett |
| vs. | ) | Magistrate Judge Schenkier |
| | ) | |
| ABBOTT LABS, KATHERINE GREEN, | ) | |
| KENNETH A. WILSON and MAURIZO | ) | |
| ACQUASALIENTE, | ) | |
| Defendants. | ) | |

## PLAINTIFF'S FOURTH AMENDED COMPLAINT

**NOW COMES** Plaintiff, **DIEP X. HOANG,** by and through her attorney Gregory H. Andrews of ANDREWS KOEHLER & PASSARELLI, P.C. and, complaining of the Defendants, ABBOTT LABS, KATHERINE GREEN, KENNETH A. WILSON, and MAURIZO ACQUASALIENTE, states as follows:

### Statement of the Case

1.      This cause of action for Plaintiff, DIEP X. HOANG, arises under Title VII of the Civil Rights Act, 42 U.S.C. 2000e *et seq.*, as amended; the Illinois Human Rights Act, 755 ILCS 5/1-101, *et seq.*, as amended; the American's with Disabilities Act, 42 U.S.C. 12101, *et seq.*, as amended; the Family and Medical Leave Act, 29 U.S.C. 2601, *et seq.*, retaliation, and pendent state law claims of unlawful restraint, intentional infliction of emotional distress, and violations of the Illinois Personnel Records Review Act, 820 ILCS 40/1 *et seq.*

## The Parties

2.     Plaintiff, DIEP X. HOANG, a female, is a citizen of the United States and a resident of the State of Illinois, residing in the Northern District of Illinois. At all times relevant, Plaintiff was employed by Defendant ABBOTT LABS ("Abbott") at their North Chicago, Illinois location. Plaintiff, during the periods in question, was a scientist assigned to work in the Clarithromycin Group ("Clari Group") and to the Ritonavir Group.

3.     Defendant, ABBOTT LABS ("Abbott") is an Illinois corporation, engaged in an industry affecting commerce and at all times relevant, employed fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar years.

4.     Defendant, KATHERINE GREEN ("Green"), is a citizen of the United States and a resident of the State of Illinois. At all time relevant, Green was employed as a Human Resources Representative by Abbott.

5.     Defendant, KENNETH WILSON ("Wilson"), is a resident of the State of Illinois. At all times relevant, Wilson was employed as a scientist and Department Manager by Abbott.

6.     Defendant, MAURIZO ACQUASALIENTE ("Acquasaliente") is a resident of the State of Illinois. At all times relevant, Acquasaliente was employed as a scientist and Group Leader by Abbott in the combined Clari/Ritonavir Groups.

## Jurisdiction and Venue

7.     This action properly lies in the Northern District of Illinois because the claims for relief arose out of incidents occurring in the State of Illinois and in this judicial district.

8.     This court has jurisdiction over plaintiff's federal claims pursuant to 42 U.S.C. §2000. This court has concurrent jurisdiction over plaintiff's state claims.

2

9.    At all relevant times hereto, Defendant Abbott is and was an employer pursuant to § 701(b) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b). For purposes of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a) Defendant is an employer who employs in excess of fifteen employees.

### Exhaustion of Remedies

10.    On or about November 12, 2002, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, satisfying the requirements of 42 U.S.C. §2000e-5(b) and (c), Charge #210A300078.

11.    On or about January 31, 2003, the Equal Employment Opportunity Commission issued a notice of Right-to-Sue to plaintiff with respect to plaintiff's charges of discrimination.

12.    Plaintiff has exhausted the administrative remedies necessary for the filing of this complaint.

13.    Plaintiff timely filed her complaint on April 30, 2003, within ninety days of her notice of Right-to-Sue.

### COUNT I
### SUPERVISORY SEXUAL HARASSMENT ABBOTT LABS

14.    Plaintiff adopts and incorporates paragraphs 1 through 13 as if fully set forth herein as paragraphs 1 through 14 of this Count I.

15.    Plaintiff is a member of a protected class, female.

16.    Stephen Montgomery ("Montgomery") at all times relevant was and continues to be a member of Abbott management and was a manager in the Clari Group.

3

17.    Plaintiff was subjected to unwelcome harassment beginning in 1996 and continuing until her termination by Abbott in January 2002, including but not limited to the following:

    a.    Beginning in January 1997, Montgomery began sending love letters, "vision" letters and notes to Plaintiff.

    b.    In November 1996, Montgomery invited Plaintiff to his home to meet his family and to discuss his mentoring of Plaintiff and how Plaintiff could become a successful chemist/leader at Abbott.  Montgomery advised Plaintiff that he frequently invited people from his "group" to his home.  When Plaintiff arrived, no one was present at the house except for Montgomery and Plaintiff.

    c.    From December 1996 until December 2001, Montgomery followed Plaintiff around the Abbot campus and appeared in Plaintiff's lab at least once a day whenever both Montgomery and Plaintiff were working.

    d.    Beginning in January 1997, Montgomery waited for Plaintiff at the North Chicago train station.

    e.    Beginning in January 1997, Montgomery began sending gifts and flowers to Plaintiff.

    f.    In December, 1997, knowing that Plaintiff was Catholic and Vietnamese, Montgomery sent plaintiff a book about witches and sorcerers of Vietnam, which Plaintiff found offensive and deeply disturbing.

4

g.    On August 10, 1998, Montgomery asked Plaintiff if he could attend the Interscience Conference on Antimicrobial Agents and Chemotherapy (ICAAC conference) with Plaintiff in San Diego.

h.    On September 23, 1998, Montgomery followed Plaintiff to O'Hare Airport, where she was to board a plane for the ICAAC Conference. Plaintiff cried in fear and Montgomery began to kiss Plaintiff. Montgomery took Plaintiff to his car where he sexually assaulted Plaintiff.

i.    Upon Plaintiff's return from San Diego on September 25, 1998, Montgomery asked Plaintiff if she wanted to lose her virginity. Montgomery took Plaintiff to the Hilton Hotel near the O'Hare International Airport, where he physically and sexually assaulted Plaintiff, then gave her a jade bracelet.

j.    Montgomery repeatedly told Plaintiff that he loved her.

k.    While on medical leave following the sexual assault of September 25, 1998, Montgomery continued to contact Plaintiff at her home and while resting in California, informing Plaintiff and her relatives that he was in love with Plaintiff.

l.    In January 1999, while Plaintiff remained on medical leave, Montgomery contacted Plaintiff and her brother, requesting that Plaintiff not quit her position, promising that the work environment would change for the better, and promising Plaintiff a raise and promotion.

m.   Upon return from medical leave, in February 1999, although no longer working in the Clari group, Montgomery continued to visit Plaintiff in her lab every day.

n.   Between February and April 1999, Montgomery sexually assaulted Plaintiff in various conference rooms, unoccupied offices and a storage room of building R13 at the Abbot campus.

o.   During Easter weekend 1999, Montgomery requested Plaintiff meet him at the Abbot campus, but Plaintiff did not go.

p.   In or about April of 1999, Plaintiff received a poor performance evaluation, which Montgomery later admitted he wrote.

q.   During the summer of 1999, Plaintiff's lab was moved away from the Clari lab to the Ritonavir lab.  Montgomery continued to visit Plaintiff at her new location.  Montgomery continued to kiss and fondle Plaintiff.

r.   From 1999 until her termination, Montgomery continued to send letters, notes and cards to Plaintiff.

s.   Immediately after Plaintiff's return to work, on February 4, 1999, Montgomery told Plaintiff's former manager Mel Hodkinson to tell Plaintiff that "she was already dead" and he did so.

t.   On April 13, 2001, Montgomery sent Plaintiff an email asking her if she still had her dog.

u.   On May 9, 2001, Montgomery sent Plaintiff an email warning her not to ask about her performance evaluations.

      v.     While on Plaintiff's second medical leave of absence from November 2001 through her termination in January 2002, Montgomery sent cards to Plaintiff's home asking her to return to work.

18.     Wilson was a member of Abbott management and was the alter ego of Abbott.

      a.   Wilson was a Department Manager.

      b.   Wilson acted in conformity with express instructions provided to him by Abbott.

      c.   Wilson instructed Plaintiff on who she could correspond with within Abbott, including limiting such contacts to Tom Campbell, Laura Song, or himself.

      d.   Wilson instructed Plaintiff to cease sending emails.

      e.   Wilson set forth the reporting order and group composition for Plaintiff, including having Plaintiff report to Acquasaliente.

      f.   Wilson required Plaintiff's attendance at Department meetings.

      g.   Wilson held three meetings with Plaintiff and Green from Human Resources demanding Plaintiff report to Acquasaliente and divulge her proprietary inventions and ideas.

19.     Green was a member of management and was the alter ego of Abbott.

      a.   Green represented Abbott Human Resources Department.

      b.   Green acted in conformity with express instructions provided to her by Abbott.

      c.   Green attended meetings with Wilson and Plaintiff requiring Plaintiff report to Acquasaliente and divulge her proprietary inventions and ideas.

7

20.    Acquasaliente was a member of management and was the alter ego of Abbott.

    a.    Acquasaliente acted in conformity with express instructions provided to him by Abbott.

    b.    Acquasaliente was promoted to a management position in the fall of 2001 and took over management of the Ritonavir Group.

    c.    Prior to his promotion, Acquasaliente was a member of the Clari Group.

    d.    Under the new arrangements, Plaintiff would report directly to Acquasaliente.

    e.    Acquasaliente reported to Wilson and Green.

    f.    Acquasaliente had access to Plaintiff's personnel records, including grade level and salary information.

    g.    Acquasaliente demanded Plaintiff attend one-on-one meetings with him.

21.    The harassment Plaintiff complains of was based upon sex.

22.    The harassment Plaintiff was subject to had the purpose and effect of unreasonably interfering with Plaintiff's work performance and causing numerous job detriments in the following ways:

    a.    Plaintiff came under the care of a physician for physical and mental health ailments following the sexual assault in 1998 and was required to take a medical leave of absence from September 1998 through January 1999.

    b.    Plaintiff received less favorable performance reviews following the sexual assault.

8

c.   Plaintiff was transferred to a less desirable work group and given less meaningful work assignments following her 1998 medical leave.

d.   Plaintiff was required to take a second medical leave of absence for physical and mental health disabilities in November 2001 because of continued harassment by Montgomery and Abbott.

e.   The harassment had the purpose and effect of creating an intimidating, hostile and offensive work environment.

23.   Plaintiff was subject to unwelcome harassment from the defendants until her termination by Abbott in January 2002.

a.   Plaintiff was reassigned and isolated from other employees upon her return to work following her medical leave from September 1998 through January 1999.

b.   Plaintiff was told the reassignment was based upon a headcount cutback, but Plaintiff's position in the group was replaced by three male scientists.

c.   Plaintiff was not allowed to work on her inventions and ideas.

d.   Plaintiff was not promoted above a grade level 11.

e.   Based upon her grade level, Plaintiff received lower pay than other similarly qualified scientists.

f.   Plaintiff received only fifty shares of Abbott stock when she was awarded Scientist of the Year in 1998. Acquasaliente received 100 shares of Abbot Stock when he was Scientist of the Year in 2001.

g.   Abbott failed to follow its performance review or evaluation procedures as they related to Plaintiff by not providing her with a review in 1994 and by

9

permitting Montgomery, someone not her supervisor, to write her 1998 review.

h.   Plaintiff was subject to reprimand for making routine inquiries of a scientist's background.

i.   Plaintiff was kept in an enclosed office for hours and barred from exiting the office room until she agreed to report to Wilson and Acquasaliente and divulge her proprietary inventions and ideas.

j.   Plaintiff received harassing emails from Wilson and Acquasaliente in the fall of 2001, requiring her to report to Acquasaliente in direct violation of her physician's orders.

k.   Plaintiff received harassing correspondence from Abbott while on medical leave of absence regarding her position at Abbott.

24.   Plaintiff believed that she had to subject herself to such offensive behavior because the parties involved were her supervisors and members of Abbott management.

25.   Plaintiff attempted to remedy some of the harassing conduct herself, by requesting Montgomery stop all conversations, attention, and unnecessary visits, to no avail.

26.   Plaintiff complained to Abbott on numerous occasions in accordance with Abbott's Code of Business Conduct:

a.   Plaintiff's request for disability benefits completed on October 21, 1998 indicated that the purpose for her disability request was "work related." Abbott failed to undertake any investigation of these allegations.

b.   Plaintiff repeatedly requested Montgomery cease his behavior.

10

c.   On May 10, 2001, Plaintiff reported the harassment to Laura Song of Abbott Human Resources. No investigation or corrective action occurred.

d.   On July 5, 2001, Plaintiff reported the harassment to Wilson in a meeting. No investigation or corrective action occurred.

e.   On August 29, 2001, Plaintiff reported to Cindy Perez of Abbott Human Resources that she continued to receive emails from Montgomery. No investigation or corrective action occurred.

f.   Plaintiff provided a doctor's note dated March 26, 2001, indicating her psychosis occurred while working with the Clari Group and advising that working with those same employees would be detrimental to Plaintiff's health. No investigation or corrective action occurred.

g.   Plaintiff provided a doctor's note dated November 12, 2001, indicating that she was receiving treatment for stress related to harassment at work. No investigation or corrective action occurred.

27.   Abbott condoned sexual harassment and failed to maintain a harassment-free work environment by failing to take effective corrective actions against Montgomery and by engaged in harassing conduct as an entity:

a.   In April 2001, Plaintiff provided Abbott Human Resources with a physician's note dated March 26, 2001, indicating that it would be detrimental to her physical and mental health for Plaintiff to work with members of the Clari Group.

b.   Laura Song acknowledged receipt of the doctor's note on April 11, 2001.

c.    After Plaintiff made her harassment allegations to Song, Plaintiff's
computer data was deleted and her computer was encrypted, resulting in
the inability of Plaintiff to print emails or company policies.

d.    Plaintiff's group was consolidated with the Clari Group and Plaintiff was
required to report to and attend one-on-one meetings with Acquasaliente, a
member of the Clair Group, in direct violation of her physician's orders
beginning in October 2001.

e.    When Plaintiff questioned whether Acquasaliente was from the Clari
Group, Plaintiff was disciplined and threatened with termination.

f.    Plaintiff was not offered an alternative position until November, 2001.

g.    The position offered to Plaintiff was in the Fermentation Chemistry
Research and Development section.  Plaintiff was not provided with a job
description or a grade level for the alternative position offered.

h.    Plaintiff did not have an opportunity to accept or decline the alternative
position as she was terminated while on medical leave shortly after the
alternative position was offered to her.

28.    Abbott failed to take prompt, appropriate corrective action to alleviate the
discrimination.

29.    On November 21, 2001, Plaintiff became physically and mentally ill due to the
continued harassment and took medical leave of absence.

30.    Montgomery continued to harass Plaintiff while she was on medical leave,
including sending her cards of a personal nature and requesting she return to work.

12

31.    Plaintiff received harassing and intimidating letters from Abbott while on medical leave in the fall of 2001 and through early 2002.

32.    Abbott's final tangible employment action against Plaintiff was its termination of Plaintiff on January 16, 2002.

33.    As a direct and proximate result of said unlawful employment practices, Plaintiff has lost and will continue to lose substantial income, including but not limited to wages, fringe benefits, seniority benefits, retirement benefits and other employment benefits that are due her.

34.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered the indignity of discrimination, the invasion of her right to be free from discrimination, and great humiliation which is manifest in physical illness and emotional stress on Plaintiff.

35.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and former co-workers, damage to her reputation, disruption of her personal life, and loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in her favor and against Defendant Abbott and award her reasonable compensatory damages, punitive damages, attorney's fees and any other relief that this Court deems just and equitable.

## COUNT II
## SEX DISCRIMINATION

36.    Plaintiff is a member of a protected class, female.

13

37.    Plaintiff suffered an adverse employment action in the form of termination of her employment on January 16, 2002.

38.    Plaintiff was qualified for her position.  Plaintiff was a microbiologist with a bachelor of science degree and over 9 years of experience at Abbott.

39.    Plaintiff has been subjected to discrimination on the basis of her gender in one or more of the following ways:

   a.    Plaintiff was reassigned and isolated from other employees upon her return to work following her medical leave from September 1998 through January 1999.

   b.    Plaintiff was told the reassignment was based upon a headcount cutback, but Plaintiff's position in the group was replaced by three male scientists.

   c.    Plaintiff was not allowed to work on her inventions and ideas.

   d.    Plaintiff was not promoted above a grade level 11.

   e.    Based upon her grade level, Plaintiff received lower pay than other similarly qualified male scientists.

   f.    Plaintiff received only fifty shares of Abbott stock when she was awarded Scientist of the Year in 1998.  Acquasaliente, a male scientist, received 100 shares of Abbot Stock when he was Scientist of the Year in 2001.

   g.    Abbott failed to follow its performance review or evaluation procedures as they related to Plaintiff by not providing her with a review in 1994 and by permitting Montgomery, someone not her supervisor, to write her 1998 review.

14

> h.  Plaintiff was subject to reprimand for making routine inquiries of a male
>     scientist's background.
>
> i.  Rules and regulations were applied differently to Plaintiff, for example in
>     1998, Plaintiff needed only provide copies of her doctor's notes to support
>     her disability leave. Such notes were not accepted by Abbott in 2001.

40.  Plaintiff was subjected to an offensive and sexually hostile work environment that her male counterparts were not subjected to.

41.  Plaintiff was forced to endure sexually harassment, sexual assault and abuse as a condition of her employment.

42.  Plaintiff complained to Abbott on numerous occasions:

> a.  Plaintiff's request for disability benefits completed on October 21, 1998
>     indicated that the purpose for her disability request was "work related."
>     Abbott failed to undertake any investigation of these allegations.
>
> b.  Plaintiff repeatedly requested Montgomery cease his behavior.
>
> c.  On May 10, 2001, Plaintiff reported the harassment to Song. No
>     investigation or corrective action occurred.
>
> d.  On July 5, 2001, Plaintiff reported the harassment to Wilson in a meeting.
>     No investigation or corrective action occurred.
>
> e.  On August 29, 2001, Plaintiff reported to Perez that she continued to
>     receive emails from Montgomery. No investigation or corrective action
>     occurred.
>
> f.  Plaintiff provided a doctor's note dated March 26, 2001, indicating her
>     psychosis occurred while working with the Clari Group and advising

15

working with those same employees would be detrimental to Plaintiff's health. No investigation or corrective action occurred.

    g.    Plaintiff provided a doctor's note dated November 12, 2001, indicating that she was receiving treatment for stress related to harassment at work. No investigation or corrective action occurred.

43.    Abbott failed to take prompt, appropriate corrective action to alleviate the discrimination.

44.    Abbott terminated Plaintiff's employment on January 16, 2002.

45.    As a direct and proximate result of said unlawful employment practices, Plaintiff has lost and will continue to lose substantial income, including but not limited to wages, fringe benefits, seniority benefits, retirement benefits and other employment benefits that are due her.

46.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered the indignity of discrimination, the invasion of her right to be free from discrimination, and great humiliation which is manifest in physical illness and emotional stress on Plaintiff.

47.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and former co-workers, damage to her reputation, disruption of her personal life, and loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in her favor and against Defendant Abbott and award her reasonable compensatory damages, punitive damages, attorney's fees and any other relief that this Court deems just and equitable.

## COUNT III
## AMERICAN'S WITH DISABILITIES ACT

48.    Plaintiff is disabled.

49.    Plaintiff has a medically diagnosed mental condition.

50.    Plaintiff's medical condition substantially limits her ability to perform major life activities including caring for herself and working.

51.    Plaintiff is duly qualified to perform the functions of her job.

52.    With reasonable accommodation, Plaintiff could have performed the essential functions of her job.

53.    Defendants were aware of Plaintiff's disability as early as April 2001 and took no steps to engage in meaningful dialogue to explore possible reasonable accommodations that would allow her to perform the essential functions of her job.

54.    Plaintiff's disability could have been easily accommodated by not requiring Plaintiff to report to scientists who had been or were members of the Clari Group.

55.    Defendants had a lengthy period of time to discuss accommodating Plaintiff's disability, from March 2001, when Defendant's were put on notice of recommendations by Plaintiff's physician until October when Acquasaliente was promoted to group leader.

56.    Defendants demanded that Plaintiff work in an environment that was in direct conflict with her physician's note of March 26, 2001.

57.    Defendants failed and refused to make any reasonable accommodation of Plaintiff's disability.

58.    Defendants retaliated against Plaintiff for requesting accommodation of her disability by confining Plaintiff to an enclosed office for hours on three separate occasions, demanding she report to Acquasaliente.

17

59.     Defendants further retaliated against Plaintiff by terminating her employment while she was on leave receiving treatment for her disability.

60.     Plaintiff was subjected to unlawful discrimination because of her disability in the following ways:

a.     Plaintiff was reassigned and isolated from other employees upon her return to work following her medical leave from September 1998 through January 1999.

b.     Plaintiff was told the reassignment was based upon a headcount cutback, but Plaintiff's position in the group was replaced by three non-disabled scientists.

c.     Plaintiff was not allowed to work on her inventions and ideas.

d.     Plaintiff was not promoted above a grade level 11.

e.     Based upon her grade level, Plaintiff received lower pay than other similarly non-disabled qualified scientists.

f.     Plaintiff received only fifty shares of Abbott stock when she was awarded Scientist of the Year in 1998. Acquasaliente, a non-disabled scientist, received 100 shares of Abbot Stock when he was Scientist of the Year in 2001.

g.     Abbott failed to follow its performance review of evaluation procedures as they related to Plaintiff by not providing her with a review in 1994 and by permitting Montgomery, someone not her supervisor, to write her 1998 review.

18

h.    Plaintiff was subject to reprimand for making routine inquiries of a scientist's background.

i.    Rules and regulations were applied differently to Plaintiff, for example in 1998, Plaintiff needed only provide copies of her doctor's notes to support her disability leave. Such notes were not accepted by Abbott in 2001.

j.    Plaintiff's group was consolidated with the Clari Group and Plaintiff was required to report to and attend one-on-one meetings with Acquasaliente, a member of the Clair Group, in direct violation of her physician's orders beginning in October 2001.

k.    When Plaintiff questioned whether Acquasaliente was from the Clari Group, Plaintiff was disciplined and threatened with termination.

61.    Abbott terminated Plaintiff's employment on January 16, 2002.

62.    As a direct and proximate result of said unlawful employment practices, Plaintiff has lost and will continue to lose substantial income, including but not limited to wages, fringe benefits, seniority benefits, retirement benefits and other employment benefits that are due her.

63.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered the indignity of discrimination, the invasion of her right to be free from discrimination, and great humiliation which is manifest in physical illness and emotional stress on Plaintiff.

64.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment

19

among her family, friends, and former co-workers, damage to her reputation, disruption of her personal life, and loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in her favor and against Defendant Abbott and award her reasonable compensatory damages, including front pay and back pay, punitive damages, attorney's fees and any other relief that this Court deems just and equitable.

## COUNT IV
## RETALIATION

65.    Plaintiff adopts and incorporates paragraphs 1 through 64 of this Complaint as though fully set forth in this Count IV.

66.    Throughout her employment, while an employee of Abbott, Plaintiff repeatedly opposed the acts of sexual harassment, sex discrimination, race discrimination, disability discrimination, and equal pay violations committed by management.

67.    Plaintiff opposed the acts of sexual harassment and sex discrimination committed by Steve Montgomery, a manger of Abbott, and also committed by Abbott.

68.    In 2001 when Plaintiff questioned her salary, grade level or performance reviews and obtained a physician's note recommending she not work with scientists in the Clair Group, Plaintiff was retaliated against in the following ways:

    a.    Plaintiff was never promoted above a grade 11 scientist.

    b.    Plaintiff was disciplined for failing to attend meetings with the Clari Group, in direct violation of her physician's orders.

    c.    Plaintiff was disciplined for questioning the background of her supervisors.

      d.     Plaintiff was disciplined for inquiring into her salary, grade level and performance reviews.

69.    As a direct and proximate result of her opposition to the sexual harassment, sex discrimination, race discrimination, disability discrimination, and equal pay violations, Plaintiff was forced to endure at the workplace, the Plaintiff suffered mental and physical harm, requiring ongoing care and treatment.

70.    As a direct and proximate result of her opposition to the sexual harassment, sex discrimination, race discrimination, disability discrimination and equal pay violations that Plaintiff was forced to endure at the workplace, the Plaintiff was required to take a disability leave of absence in November 2001.

71.    Abbott terminated Plaintiff while she was on this disability leave of absence in January 2002.

72.    As a direct and proximate result of said unlawful employment practices, Plaintiff has lost and will continue to lose substantial income, including but not limited to wages, fringe benefits, seniority benefits, retirement benefits and other employment benefits that are due her.

73.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered the indignity of discrimination, the invasion of her right to be free from discrimination, and great humiliation which is manifest in physical illness and emotional stress on Plaintiff.

74.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment

among her family, friends, and former co-workers, damage to her reputation, disruption of her personal life, and loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in her favor and against Defendant Abbott and award her reasonable compensatory damages, including front pay and back pay, punitive damages, attorney's fees and any other relief that this Court deems just and equitable.

### COUNT V
### VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT

75.     Abbott is an employer within the Meaning of the Family and Medical Leave Act ("FMLA"), as it is engaged in commerce and employs fifty or more employees during each of twenty or more calendar weeks.

76.     Plaintiff was an eligible employee within the meaning of the FMLA, as Plaintiff has been employed by Abbott for at least twelve months and had worked for at least 1250 hours during the previous twelve month period.

77.     Abbott maintained a policy of Family Leave of Absence (FLOA) prior to implementation of the FMLA and intended to comply with the Family and Medical Leave Act.

78.     Abbott's FLOA policy indicates that to be eligible for leave, an employee may be required to provide medical certification "acceptable" to Abbott's Employee Health Department.

79.     Plaintiff suffered from her own serious medical condition and took disability leave under the Abbott FLOA policy in September 1998 through January 31, 1999. During that time period, Abbott accepted Plaintiff's physician's notes as acceptable medical certification her need for leave.

80.     Plaintiff suffered from her own serious medical condition as evidenced by doctor's notes and medical records supplied to Abbott as early as March 2001.

22

81.    Plaintiff again availed herself of the protections of the FMLA in November 2001.

82.    During the month of November 2001, Abbott provided Plaintiff with no less than five letters requesting medical certification, each letter changing the date in which Plaintiff's FMLA leave period began.

83.    During the month of November 2001, Abbott assigned no less than two different leave coordinators to Plaintiff, neither of whom attempted to personally contact Plaintiff.

84.    During Plaintiff's 2001 medical leave, Plaintiff provided medical notes from her physicians evidencing Plaintiff's medical condition and need for leave, as she had done and as had been accepted during her 1998 medical leave.

85.    Plaintiff was not advised that the physician's notes provided in 2001 and 2002 were now insufficient medical certifications. Plaintiff was only advised that no medical certification had been received.

86.    In violation of Department of Labor regulations, Abbott did not provide Plaintiff with an opportunity to cure her defective FMLA certification. (29 CFR §825.305(d).)

87.    Plaintiff suffered an adverse employment action, the termination of her employment, while she was within the 12-week period of job protected leave provided under the FMLA.

88.    A causal connection exists between Plaintiff's protected activity and the adverse employment action.

89.    As a direct and proximate result of said unlawful employment practices, Plaintiff has lost and will continue to lose substantial income, including but not limited to wages, fringe benefits, seniority benefits, retirement benefits and other employment benefits that are due her.

90.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and former co-workers, damage to her reputation, disruption of her personal life, and loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in her favor and against Defendant Abbott and award her actual compensatory damages, including back pay, liquidated damages in an amount equal to back pay and actual damages, attorney's fees and any other relief that this Court deems just and equitable.

## COUNT VI
## UNLAWFUL RESTRAINT

91.    Wilson was a member of Abbott management and was the alter ego of Abbott.

    a.   Wilson was a Department Manager.

    b.   Wilson acted in conformity with express instructions provided to him by Abbott.

    c.   Wilson instructed Plaintiff on who she could correspond with within Abbott, including limiting such contacts to Tom Campbell, Laura Song, or himself.

    d.   Wilson instructed Plaintiff to cease sending emails.

    e.   Wilson set forth the reporting order and group composition for Plaintiff, including having Plaintiff report to Acquasaliente.

    f.   Wilson required Plaintiff's attendance at Department meetings.

24

      g. Wilson held three meetings with Plaintiff and Green from Human Resources demanding Plaintiff report to Acquasaliente and divulge her proprietary inventions and ideas.

92.    Green was a member of management and was the alter ego of Abbott.

      a. Green represented Abbott Human Resources Department.

      b. Green acted in conformity with express instructions provided to her by Abbott.

      c. Green attended meetings with Wilson and Plaintiff requiring Plaintiff report to Acquasaliente and divulge her proprietary inventions and ideas.


93.    Acquasaliente was a member of management and was the alter ego of Abbott.

      a. Acquasaliente acted in conformity with express instructions provided to him by Abbott.

      b. Acquasaliente was promoted to a management position in the fall of 2001 and took over management of the Ritonavir Group.

      c. Prior to his promotion, Acquasaliente was a member of the Clari Group.

      d. Under the new arrangements, Plaintiff would report directly to Acquasaliente.

      e. Acquasaliente reported to Wilson and Green.

      f. Acquasaliente had access to Plaintiff's personnel records, including grade level and salary information.

      g. Acquasaliente demanded Plaintiff attend one-on-one meetings with him.

94.    On November 2, 2001, Green and Wilson approached Plaintiff and instructed her to follow them into the office of Acquasaliente, who was also present in his office at 8:15 a.m. The door was closed and Plaintiff was instructed to sit down.

95.    Plaintiff was seated against a wall and Green, Wilson and Acquasaliente were seated in front of the closed door.

96.    During this meeting, Green and Wilson informed Plaintiff that she was to report to Acquasaliente and attend department meetings, which would include Montgomery and were in violation of her doctor's orders, or she would have to transfer to another group.

97.    If Plaintiff sought to move to another group, she was instructed that she must relinquish her proprietary ideas and inventions for other scientists in the group to work on.

98.    Plaintiff got up from her seat to return to her lab to check on her work.  Neither Green, Wilson nor Acquasaliente moved their seats from the front of the door, and Plaintiff was physically prevented from exiting the room.  Green told Plaintiff she could not leave until Plaintiff agreed to give up her proprietary ideas and inventions.

99.    Plaintiff involuntarily returned to her seat where she remained until approximately 12:00 noon, when Green informed Plaintiff that she could leave and Green, Wilson and Acquasaliente allowed her to exit.

100.    On November 12, 2001, at approximately 8:30 a.m., Green and Wilson asked Plaintiff to report to Acquasaliente's office.

101.    The door was closed and Green and Wilson began to interrogate Plaintiff and again asked Plaintiff to relinquish her ideas and inventions.

102.    Plaintiff was seated against a wall and Green and Wilson were seated in front of the closed door.

26

103.    Plaintiff was physically blocked from leaving the office and involuntarily restrained until approximately 12:00 noon.

104.    On November 20, 2001, Green and Wilson took Plaintiff to Acquasaliente's office around 9:00 a.m. and closed the door.

105.    Green and Wilson again interrogated Plaintiff about her inventions and ideas.

106.    Plaintiff was seated against a wall and Green and Wilson were seated in front of the closed door.

107.    Plaintiff was physically blocked from leaving the office and involuntarily restrained for several hours.

108.    Defendants had no legal authority to restrain Plaintiff.

109.    On each occasion, Plaintiff attempted to exit the office and was stopped by Green and/or Wilson.

110.    As a direct and proximate result of said unlawful confinement Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself, harm to her employability and earning capacity, painful embarrassment among her family, friends, and former co-workers, damage to her reputation, disruption of her personal life, and loss of enjoyment of the ordinary pleasures of life.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in her favor and against Defendants Green, Wilson, and Acquasaliente, and award her damages in an amount commensurate to compensate Plaintiff for the damages she suffered together with punitive damages and the costs of this action.

27

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

111.   Wilson was a member of Abbott management and was the alter ego of Abbott.

    a.   Wilson was a Department Manager.

    b.   Wilson acted in conformity with express instructions provided to him by Abbott.

    c.   Wilson instructed Plaintiff on who she could correspond with within Abbott, including limiting such contacts to Tom Campbell, Laura Song, or himself.

    d.   Wilson instructed Plaintiff to cease sending emails.

    e.   Wilson set forth the reporting order and group composition for Plaintiff, including having Plaintiff report to Acquasaliente.

    f.   Wilson required Plaintiff's attendance at Department meetings.

    g.   Wilson held three meetings with Plaintiff and Green from Human Resources demanding Plaintiff report to Acquasaliente and divulge her proprietary inventions and ideas.

112.   Green was a member of management and was the alter ego of Abbott.

    a.   Green represented Abbott Human Resources Department.

    b.   Green acted in conformity with express instructions provided to her by Abbott.

    c.   Green attended meetings with Wilson and Plaintiff requiring Plaintiff report to Acquasaliente and divulge her proprietary inventions and ideas.

113.   Acquasaliente was a member of management and was the alter ego of Abbott.

28

a. Acquasaliente acted in conformity with express instructions provided to him by Abbott.

b. Acquasaliente was promoted to a management position in the fall of 2001 and took over management of the Ritonavir Group.

c. Prior to his promotion, Acquasaliente was a member of the Clari Group.

d. Under the new arrangements, Plaintiff would report directly to Acquasaliente.

e. Acquasaliente reported to Wilson and Green.

f. Acquasaliente had access to Plaintiff's personnel records, including grade level and salary information.

g. Acquasaliente demanded Plaintiff attend one-on-one meetings with him.

114.    Defendant Abbott's conduct was extreme and outrageous consisting of six years of unlawful sexual harassment, sexual discrimination and disability discrimination.

115.    Defendants Green, Wilson and Acquasaliente's actions were extreme and outrageous, consisting of unlawfully confining Plaintiff in an office for several hours on three occasions.

116.    Defendants Green, Wilson and Abbott actions were extreme and outrageous, in requiring Plaintiff to report to group leaders and attending department meetings consisting of individuals she had accused of harassment and in direct violation of her physician's orders.

117.    Defendants' activities were intended to inflict severe emotional distress.

118.    Defendants were aware of Plaintiff's susceptibility to emotional distress from her 1998-1999 medical leave of absence, physician notes provided to it by Plaintiff in 2001 and Defendants should have known that their actions would inflict severe emotional distress.

29

119.    Plaintiff did suffer severe emotional injury in the form of leaves of absence from September 1998 through January 1999 and November 2001 until her termination due to physical and mental injury resulting from the extreme stress of her work environment.

120.    Plaintiff has been undergoing treatment for her physical and mental condition since 1998 and will continue to receive treatment indefinitely.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in her favor and against Defendants and award her damages in an amount commensurate to compensate Plaintiff for the damages she suffered together with punitive damages and the costs of this action.

## COUNT VIII
## VIOLATION OF ILLINOIS PERSONNEL RECORDS REVIEW ACT

121.    Illinois grants an employee an absolute right to review their personnel records upon request to the employer and may also obtain copies of same. See 820 ILCS 40/1 *et seq.*

122.    Abbott is an employer within the meaning of the Illinois Personnel Records Review Act as Abbott employs five or more employees in the State of Illinois.

123.    Plaintiff was an employee within the meaning of the Act, as Plaintiff was employed and was on leave of absence with a right to return to a position with Abbott in 2001 and 2002.

124.    Plaintiff requested to review her personnel file.

125.    Abbott impermissibly and absolutely refused to let Plaintiff review her personnel file until she returned items Abbott claimed was their property. (Ex. 45.)

126.    The Act does not provide the employer any absolute right to refuse review of personnel files or to grant the right only in exchange for return of property.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment in her favor and against Defendants Abbott, and award her damages in the statutory amount of $200 plus actual damages, court costs and attorneys fees. Plaintiff additional prays that this court enter an order preventing Abbott from using any information contained in Plaintiff's personnel file in defense of this action.

**DIEP X. HOANG**

By: _____

Gregory H. Andrews, Esq.

Gregory H. Andrews
ANDREWS KOEHLER & PASSARELLI, P.C.
4343 Commerce Court, Suite 615
Lisle, Illinois 60532
(630) 505-9939 (Telephone)
(630) 505-9969 (Facsimile)

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that she served a true and correct copy of

Plaintiff's **FOURTH AMENDED COMPLAINT** upon the below-noticed individual(s) via U.S.

Mail, first class postage prepaid on this 18th day of March, 2005.

Hubert O. Thompson
Ronald Austin, Jr.
Brothers & Thompson, P.C.
100 West Monroe Street, Suite 1700
Chicago, Illinois 60603

Julie A. Govreau

# Exhibit G

**Page 1**

1

2          IN THE UNITED STATES DISTRICT COURT

3             NORTHERN DISTRICT OF ILLINOIS

4                    EASTERN DIVISION

5

6    DIEP X. HOANG,                    )
                                       )
7             Plaintiff,               )
                                       )
8        vs.                           )  No. 03 C 2910
                                       )
9    ABBOTT LABORATORIES, INC.,        )
     KATHERINE GREEN, KENNETH A.       )
10   WILSON, AND MAURIZIO              )
     ACQUASALIENTE,                    )
11                                     )
              Defendants.              )
12

13            The deposition of DIEP X.

14   HOANG, taken before ETTA R. JONES, Notary Public,

15   pursuant to the Federal Rules of Civil Procedure

16   for the United States District Courts pertaining

17   to the taking of depositions at 100 West Monroe

18   Street, Suite 1700, in the City of Chicago, Cook

19   County, Illinois, on the 29th day of December,

20   A.D., 2005, commencing at the hour of 10:00

21   o'clock a.m.

22

23

24

          ETTA R. JONES, C.S.R. - (773) 459-4111

---

**Page 3**

1                        I N D E X

2    EXAMINATION OF DIEP X. HOANG                PAGE

3        BY MR. THOMPSON                           6

4

5

6

7

8

9

10

11

12

13        EXHIBITS MARKED FOR IDENTIFICATION

14   Hoang Deposition Exhibit Number 1          30
     Hoang Deposition Exhibit Number 2          32
15   Hoang Deposition Exhibit Number 3          93
     Hoang Deposition Exhibit Number 4          96
16   Hoang Deposition Exhibit Number 5          97
     Hoang Deposition Exhibit Number 6          99
17   Hoang Deposition Exhibit Number 7         101
     Hoang Deposition Exhibit Number 8         101
18   Hoang Deposition Exhibit Number 9         107
     Hoang Deposition Exhibit Number 10        113
19   Hoang Deposition Exhibit Number 11        130
     Hoang Deposition Exhibit Number 12        132
20   Hoang Deposition Exhibit Number 13        134
     Hoang Deposition Exhibit Number 14        136
21   Hoang Deposition Exhibit Number 15        150
     Hoang Deposition Exhibit Number 16        151
22   Hoang Deposition Exhibit Number 17        153
     Hoang Deposition Exhibit Number 18        155
23   Hoang Deposition Exhibit Number 19        156

24

          ETTA R. JONES, C.S.R. - (773) 459-4111

---

**Page 2**

1    APPEARANCES:

2

3         ANDREWS, KOEHLER & PASSARELLI, P.C., by

4         MR. GEORGE H. ANDREWS

5         4343 Commerce Court, Suite 615

6         Lisle, Illinois  60532

7         (630) 505-9939

8              Representing the Plaintiff;

9

10        BROTHERS & THOMPSON, P.C., by

11        MR. HUBERT O. THOMPSON

12        100 West Monroe Street, Suite 1700

13        Chicago, Illinois  60603

14        (312) 372-2909

15             Representing the Defendants.

16

17

18

19

20

21

22

23

24

          ETTA R. JONES, C.S.R. - (773) 459-4111

---

**Page 4**

1          MR. THOMPSON:  Can you swear the

2    witness, please.

3              (WHEREUPON, the witness was

4                   duly sworn.)

5          MR. THOMPSON:  Would you please state

6    your name and spell your last name for the

7    record, please.

8          THE WITNESS:  My name is Diep Hoang.

9    The last name is H-o-a-n-g.

10         MR. THOMPSON:  Ms. Hoang, my name is

11   Hubert Thompson.  I represent Abbott

12   Laboratories.  I will be asking you questions

13   with regard to your lawsuit in this case.

14             It is important that you speak

15   out loud so the court reporter and I can hear

16   you.  It is important that you answer all my

17   questions orally.  So if I ask you a question,

18   you have to answer yes or no or I don't know.  If

19   you shrug or nod, the court reporter can't take

20   it down.  You have to answer clearly out loud.

21             If I ask you a question and you

22   do not understand the question, please let me

23   know, and I will try to rephrase it and put it in

24   a way that you understand it.  If you can't hear

          ETTA R. JONES, C.S.R. - (773) 459-4111

57

1    A.  He was withholding information from me.
2    Q.  He did what?
3    A.  Withholding information from me.
4    Q.  Withholding?
5    A.  Yes.
6    Q.  Anything else?
7    A.  Later on Ken Wilson forced me to give up
8  my inventions to him, my ideas, inventions to
9  Maurizio Acquasaliente.
10    Q.  That's what Ken Wilson did.  I am trying
11  to focus on what it is that you believe that
12  Acquasaliente did.  Anything else that you
13  believe he did?
14    A.  He took my ideas and he worked on them
15  without my awareness.
16    Q.  Anything else?
17    A.  He got Scientist of the Year Award for
18  my inventions.
19    Q.  Anything else?
20    A.  That's it.
21    Q.  Is that it?
22    A.  Yes.
23    Q.  Now, you said you were harassed by
24  Acquasaliente.  Are you claiming that

ETTA R. JONES, C.S.R. - (773) 459-4111

58

1  Acquasaliente sexually harassed you?
2    A.  No.
3    Q.  Now, when is it that you claim that he
4  came to your lab and broke your glassware?
5    A.  It was in 1998.
6    Q.  Did you report to him in 1998?
7    A.  No.  He was just a co-worker.  In
8  addition, he took my chemicals and reagents
9  without my awareness.
10    Q.  Focusing on the event in 1998 when he
11  was a co-worker, when in 1998 did he break your
12  glassware?
13    A.  I am sorry.
14    Q.  You say he came into your lab and broke
15  your glassware in 1998.  What month in 1998 did
16  this occur?
17    A.  It was in December.
18    Q.  December of 1998?
19    A.  The summer, the summer of 1998.
20    Q.  What were the circumstances?
21    A.  He came to my lab.  He usually borrow my
22  glasswares, but last few times he came to my lab
23  and he opened the door, he slammed the door.  It
24  broke -- purposely broke my glassware.

ETTA R. JONES, C.S.R. - (773) 459-4111

59

1    Q.  He slammed what door?
2    A.  The cabinet that I put my glassware in.
3  He opened the door and he slammed the doors.
4    Q.  Why did he do that?
5    A.  I guess because he doesn't like me.
6    Q.  Did he tell you anything?  Was there any
7  conversation that you had with him?
8    A.  No.
9    Q.  He didn't say anything to you?
10    A.  No.
11    Q.  When you say your glassware, is this
12  glassware or equipment that's provided by Abbott
13  Laboratories?
14    A.  Yes.
15    Q.  This is not something you personally
16  purchased?
17    A.  Yes.
18    Q.  So this is Abbott's property, right?
19    A.  Right.
20    Q.  You say he took your work.  What do you
21  mean by he took your work?
22    A.  He took my ideas, my discovery work.
23    Q.  When you say your discovery work, what
24  are you referring to?

ETTA R. JONES, C.S.R. - (773) 459-4111

60

1    A.  Ideas that I have for Clari project.
2    Q.  How is it that he took them?
3    A.  After I gave a presentation, then after
4  my presentation about my ideas --
5    Q.  He did what?
6    A.  He found out about my ideas after my
7  presentation.  After that he worked behind my
8  back and --
9    Q.  When you say worked behind your back,
10  what do you mean?
11    A.  He didn't let me know that he was
12  working on -- working at the same time I was
13  doing the same thing.
14    Q.  Can you give me more precise description
15  of the work that you were doing that he started
16  doing also?
17    A.  The Erythromycin process.
18    Q.  Spell that.
19    A.  E-r-y-t-h-r-o -- Erythromycin Axiom is
20  the intermediate form of Clari.
21    Q.  Okay.
22         What is it that you did
23  specifically with regard to the intermediate form
24  of Clari that he then did?

ETTA R. JONES, C.S.R. - (773) 459-4111

**Page 61**

1    A.  I found out new crystal form, crystal
2  form of Erythromycin Axiom.  That work was
3  patentable.
4    Q.  Okay.
5    A.  It was a breakthrough, and he work on
6  these -- he repeat the same work he was doing
7  behind my back and they were filing patent.
8    Q.  How do you know he was working on the
9  same thing?
10   A.  Because I ask about them.  I asked about
11 my idea, and one time he present the results in
12 my face.
13   Q.  I am sorry.  I don't understand what you
14 mean when you say presented it in your face.
15   A.  I discovered this process.  I gave a
16 presentation, and then I continued with the work.
17 At the same time, he was continuing working
18 behind my back.  Later on I supposed to give a
19 presentation again, but then he present my work
20 in my face.
21   Q.  So he made the presentation concerning
22 your work?
23   A.  Right.
24   Q.  Who did he make the presentation to?

ETTA R. JONES, C.S.R. - (773) 459-4111

**Page 62**

1    A.  To the whole group.
2    Q.  What group?
3    A.  Clari.
4    Q.  So this is something -- so this is
5  something that occurred prior to February of
6  1999?
7    A.  Correct.
8    Q.  So when he made a presentation of what
9  you believe to be your work, at some point in --
10 what year was that, by the way?
11   A.  That was in 1998.
12   Q.  -- (continuing) at some point in 1998,
13 what did you do?  Did you inform anybody that
14 this was your work or your ideas or anything?
15   A.  Steve Montgomery knew about it, and I
16 guess John Adamek also knew about that, that was
17 my idea.  They create a conflict.
18   Q.  I am sorry.  I don't understand.
19         My question was when -- if you
20 believed that Acquasaliente was working on ideas
21 that were yours and was presenting ideas that
22 were yours, did you complain to anybody about
23 that?
24   A.  I asked Steve Montgomery, yes, and John

ETTA R. JONES, C.S.R. - (773) 459-4111

**Page 63**

1  Adamek and Mel Hodkinson.
2    Q.  When did you ask them?
3    A.  After his presentation.
4    Q.  The same day?
5    A.  Yes.
6    Q.  Did you ask them in an email or did you
7  ask them in person?
8    A.  In email.
9    Q.  What did you ask them?
10   A.  I asked how did he come up with the same
11 ideas that I was working on.
12   Q.  You asked this to all three of them?
13   A.  Yes.
14   Q.  What did they say?
15   A.  Steve Montgomery, he make up some data,
16 and I knew that was a makeup, that was a lie.
17   Q.  So you believe Steve Montgomery told a
18 lie?
19   A.  Yes.
20   Q.  What was his lie?
21   A.  He told me that Maurizio was working on
22 a different condition, but actually -- this
23 different condition that gave the same results as
24 my results, but I knew that that condition would

ETTA R. JONES, C.S.R. - (773) 459-4111

**Page 64**

1  not work.  They tried to make up something.  He
2  tried to make up something.
3    Q.  He being Steve Montgomery?
4    A.  Yes.
5    Q.  What did Mel Hodkinson respond?
6    A.  He didn't say anything.
7    Q.  What did Adamek respond?
8    A.  He didn't say anything.
9    Q.  Was Mr. Montgomery's response in an
10 email to you?
11   A.  Yes.
12   Q.  In 1998?
13   A.  Yes.  I believe that Steve Montgomery
14 was the one who told Maurizio to work on my
15 ideas.
16   Q.  How do you know that?
17   A.  Because on one idea I told him --
18 because Steve Montgomery came to my lab every
19 day, and he asked me about my work.  One day I
20 discover a way to improve the Eri Axiom, and
21 Steve Montgomery was the only person at that time
22 who knew about my idea.  Then he told Maurizio to
23 work on my idea.
24   Q.  How do you know he told Maurizio to work

ETTA R. JONES, C.S.R. - (773) 459-4111

Page 73:

A. Correct, because he was not -- I didn't know that he would become my boss at the time.
Q. And you did not tell Ken Wilson what Acquasaliente did to you after Acquasaliente became your boss; is that correct?
A. Correct.
Q. Under F you said Wilson required you to attend department meetings. Do you see that?
A. Yes.
Q. Do you believe that was something that was incorrect or wrong?
A. No, that was correct.
Q. I am sorry.
A. That was correct.
Q. G. Subparagraph G under paragraph 111, you say that Wilson held three meetings with Plaintiff and Green from human resources demanding that Plaintiff report to Acquasaliente and divulge her proprietary inventions and ideas. Do you see that?
A. Yes.
Q. Who is Green?
A. She was human resource representative.
Q. There is a Katherine Green who is a

Page 74:

defendant. Is that who that is?
A. Yes. She was sent by Cindy Perez.
Q. Katherine Green reported to Cindy Perez?
A. I don't know.
Q. But you say that Cindy Perez sent Kathy Green?
A. Yes.
Q. Sent to do what?
A. To come to see me.
Q. About what?
A. About what is described in G.
Q. So Wilson had three meetings with you and Green demanding that you report to Acquasaliente. Do you see that?
A. Yes.
Q. Why were they meeting to require you to report to Acquasaliente? Is it because you were refusing to attend one-on-one meetings with him?
A. Yes.
Q. You were refusing to attend any department meetings with him?
A. Correct.
Q. So Wilson, who was the manager, and human resources representative, who was Katherine

Page 75:

Green, had meetings with you to insist that you meet with your boss, Acquasaliente; is that right?
A. Yes.
Q. Now, when you say divulge your proprietary inventions and ideas -- do you see that?
A. Yes.
Q. What proprietary inventions and ideas did you have? I am sorry. Strike that.
When you say proprietary inventions and ideas, what do you mean?
A. These patentable ideas that are useful to Abbott.
Q. But when you say proprietary, do you mean that you owned them?
A. I am the inventor.
Q. When I see the term proprietary, to me that means ownership. My question is are you alleging that you owned the inventions and ideas that you developed while you worked at Abbott?
A. Some of them, yes.
Q. Which ones did you own?
A. I came up with novel HIV protein

Page 76:

inhibitors.
Q. Ms. Hoang, I want to make sure that we are talking about the same thing. You say you came up with novel ideas. I am not disputing that. My question is you came up with these novel ideas while you were an employee of Abbott working for Abbott. Are you claiming that you owned those ideas?
A. It depends which ones you are asking about.
Q. I am asking is there any idea or invention that you developed at Abbott Laboratories that you believe you owned.
A. Can you explain the word developed.
Q. Is there anything that you worked on in any way, form or fashion --
A. That I put in practice?
Q. I am looking at G. You are referring to proprietary inventions and ideas. I want to know did you have any inventions or ideas at Abbott Laboratories that Abbott Laboratories did not own?
A. Correct, yes.
Q. You did?

ETTA R. JONES, C.S.R. - (773) 459-4111

**77**

```
1      A.  Yes.
2      Q.  Which proprietary -- strike that.
3             Which inventions and ideas that
4   you had that Abbott did not own?
5      A.  Novel class of HIV protein inhibitors.
6      Q.  Are you claiming you owned that?
7      A.  Yes, but at that time they told me to
8   give up everything, including --
9      Q.  Isn't it true, Ms. Hoang, that you had
10  signed an employment agreement with Abbott
11  Laboratories --
12     A.  Correct.
13     Q.  -- in which you agreed that every idea
14  and invention that you came up with was owned by
15  Abbott?
16     A.  Yes.
17     Q.  In fact, you signed more than one of
18  those agreements, didn't you?
19     A.  Yes.
20     Q.  Therefore, wouldn't all inventions and
21  ideas you came up with at Abbott be owned by
22  Abbott?
23     A.  Depends.
24     Q.  On what?
              ETTA R. JONES, C.S.R. - (773) 459-4111
```

**78**

```
1      A.  For example, if I have an antimalaria
2   compound and I was not working on antimalaria,
3   would Abbott own these antimalaria compounds?
4      Q.  Are you saying that you worked on
5   antimalaria compounds somewhere else other than
6   at Abbott?
7      A.  I did not work, but I came up with ideas
8   I have not put into practice yet.
9      Q.  When you are referring to inventions and
10  ideas here, are you talking about antimalaria
11  inventions and ideas?
12     A.  Yes.
13     Q.  What were the inventions and ideas --
14  did the antimalaria inventions and ideas relate
15  to your work in the Ritonavir Group?
16     A.  No.
17     Q.  Did it relate to your work in the Clari
18  Group?
19     A.  No.
20     Q.  Had you documented your ideas about
21  antimalaria drugs?
22     A.  Yes.
23     Q.  Where does the documentation exist?
24     A.  At Abbott on Abbott computer.
              ETTA R. JONES, C.S.R. - (773) 459-4111
```

**79**

```
1      Q.  Did you develop these ideas or come up
2   with these ideas while you were an employee at
3   Abbott?
4      A.  Did I develop?  I just came up with
5   ideas.  I haven't put into practice yet.
6      Q.  When you say you came up with an idea,
7   what does that mean?
8      A.  I read literature, I read patents, I
9   found loopholes, and I came up with new ideas.
10     Q.  Are you still talking specifically about
11  antimalaria?
12     A.  In general.
13     Q.  When you say in general, it confuses me.
14  Are you talking about something other than
15  antimalaria?
16     A.  Yes.
17     Q.  What else are you talking about?
18     A.  Going back to G, proprietary inventions
19  that included Abbott's -- ideas that I related to
20  Clari and relate to Ritonavir and ideas that were
21  not related to either of those projects.  So in
22  general, they forced me to give up any ideas that
23  I have at the time.
24     Q.  Let's talk about these meetings.  When
              ETTA R. JONES, C.S.R. - (773) 459-4111
```

**80**

```
1   did the meetings occur?
2      A.  In November of 2001.
3      Q.  November 2001 was the last month that
4   you physically worked on Abbott's premises; isn't
5   that correct?
6      A.  Yes.
7      Q.  In November of 2001 there were three
8   meetings.  When was the first meeting?
9      A.  I think it was sometime the first week
10  of November.
11     Q.  Do you remember which day of the week it
12  was?
13     A.  No.
14     Q.  Do you remember what time of the day it
15  was?
16     A.  It was in the morning.
17     Q.  Where did the meeting take place?
18     A.  It was in Maurizio's office.
19     Q.  How did you learn about the meeting?
20     A.  Katherine Green, Kenneth Wilson and
21  Maurizio, they came to my lab and they called me
22  into an office.  They said that they wanted to
23  talk to me.
24     Q.  So all three of these people came to
              ETTA R. JONES, C.S.R. - (773) 459-4111
```

105

```
1   away but whether you are taking appropriate steps
2   to protect it.  The first step is to be sure it
3   is in your lab notebook and it is signed, dated
4   and witnessed.  You should also prepare and
5   submit an invention disclosure.
6              Now, with regard to all of the
7   32 projects that you testified about earlier,
8   were all of those projects in your lab notebook
9   signed, dated and witnessed?
10      A.  Some of them.
11      Q.  Not all of them?
12      A.  Not all of them.
13      Q.  Did you prepare and submit an invention
14  disclosure with regard to all of them?
15      A.  I tried, but I was not allowed to.
16      Q.  So you didn't do that with regard to any
17  of them?
18      A.  They didn't let me.
19      Q.  Did you prepare an invention disclosure
20  with regard to any of the 32?
21      A.  Did I prepare any?
22      Q.  This says you should also prepare and
23  submit an invention disclosure.  My question is,
24  did you prepare an invention disclosure for any
```

ETTA R. JONES, C.S.R. - (773) 459-4111

106

```
1   of the 32 projects that you worked on?
2       A.  I was working on it.
3       Q.  You were working on what?
4       A.  Filing patent disclosure.
5       Q.  For all of them or for any of them?
6       A.  Some.  At that time I didn't have enough
7   time to write up all 32 projects, the ideas.
8       Q.  Which ones had you begun preparing an
9   invention disclosure for?
10      A.  One idea on Clari.  It is a novel
11  compound.  I had prepared but I have not -- I did
12  not submit to the patent attorney.
13      Q.  Why not?
14      A.  Because in another memo, Steve
15  Montgomery and Ken Wilson, they told me not to
16  contact Dugal Sickert or any patent attorney.
17      Q.  When was that?
18      A.  It was -- it happened in the summer of
19  2001.
20      Q.  Now, you testified that Mr. Wilson and
21  Ms. Katherine Green had you in this meeting
22  because they wanted you to give up your ideas; is
23  that correct?
24      A.  Correct.
```

ETTA R. JONES, C.S.R. - (773) 459-4111

107

```
1       Q.  Hadn't you already sent an email to
2   yourself in which you record that Ken Wilson said
3   he was not interested in your ideas?
4       A.  Yes, I did.
5       Q.  If he was not interested in your ideas,
6   why was he asking you to give them up?
7       A.  I don't know.  I had one meeting with
8   him in his office, and that was the time he told
9   me not to ask any questions about any ideas I
10  have.  So I assumed that he was not interested,
11  so I sent an email to myself.
12          MR. THOMPSON:  Let's mark this Number
13  9.
14          THE WITNESS:  He also told me that
15  Abbott was not interested in developing these
16  projects.
17              (WHEREUPON, Hoang Deposition
18               Exhibit Number 9 was marked
19               for identification.)
20          MR. THOMPSON:  Take a look at Exhibit
21  Number 9.
22              (WHEREUPON, a brief pause
23               was taken.)
24
```

ETTA R. JONES, C.S.R. - (773) 459-4111

108

```
1   BY MR. THOMPSON:
2       Q.  Have you finished reviewing it?
3       A.  Yes.
4       Q.  What is Exhibit Number 9?
5       A.  It is about Ken Wilson told me Abbott
6   was not interested in developing these 32 project
7   ideas I have.
8       Q.  So this is an email that you wrote to
9   yourself on July 17, '01?
10      A.  Correct.
11      Q.  You copied Ramesh Patel, right?
12      A.  Yes.
13      Q.  Who is Ramesh Patel?
14      A.  It is a co-worker, another co-worker.
15  He was working on a different project, and he has
16  witnessed many of my ideas.
17      Q.  Why did you cc him on this?
18      A.  Because at that time he was the only
19  person that I talked to, and I didn't know what
20  to do, how to deal with it.  I told him what
21  happened to me at that time.  So I just copy to
22  him so he knows.
23      Q.  In your email to yourself on July 17,
24  '01, you state, I had a talk with Kenny Wilson,
```

ETTA R. JONES, C.S.R. - (773) 459-4111

DIEP X. HAONG vs. ABBOTT LABORATORIES et al          DIEP X. HAONG - DECEMBER 29, 2005

Case 1:05-cv-00449-ABC Document 274   Filed 04/23/2008   Page 43 of 83

109

1  and he told me that Abbott is not interested in
2  my ideas; is that right?
3      A.  Correct.
4      Q.  Was that true?
5      A.  Yes.
6      Q.  The next thing you say is, no one takes
7  the most important ideas and give to the least
8  important person to work on.  Do you see that?
9      A.  Yes.
10     Q.  What were you talking about?
11     A.  They can say that -- I was trying to say
12 that these ideas came from me, not from somebody
13 else.
14     Q.  What are you referring to about give
15 them to the least important person to work on?
16     A.  I guess Steve Montgomery was trying to
17 take these ideas from me, and he could have said
18 that he was the one who gave me these ideas, but
19 it was not true.
20     Q.  So are you saying that Steve Montgomery
21 was the least important person?
22     A.  No.  I was the least important person in
23 the group, and I had all these ideas.  These are
24 really important ideas Steve Montgomery was

ETTA R. JONES, C.S.R. - (773) 459-4111

110

1  trying to take away from me.  What I was trying
2  to say is that Steve was the manager and he could
3  tell everybody that these important ideas came
4  from him, not from me.
5      Q.  You next state that I am taking all of
6  my 32 project ideas with me and patent them
7  myself.  Do you see that?
8      A.  Yes.
9      Q.  When you say you are taking them with
10 you, what do you mean?
11     A.  Ken Wilson told me that Abbott was not
12 interested in my ideas and Abbott was not
13 interested in developing these ideas.  So if
14 somebody is not interested, then what should I do
15 with these ideas?
16     Q.  I am not sure if that's an answer or a
17 question, but I am asking you what did you mean
18 when you said you were going to take all 32
19 projects and patent them yourself?
20     A.  I mean I am the sole inventor of these
21 ideas.
22     Q.  Okay.  Does that mean then that you
23 would own the patents?
24     A.  It doesn't say I own the patents.  I own

ETTA R. JONES, C.S.R. - (773) 459-4111

111

1  the ideas.
2      Q.  I know it doesn't say that.  That's why
3  I am asking if that's what you mean.
4      A.  I own the ideas.  If Abbott is not
5  interested in these ideas, would Abbott still own
6  these ideas?
7      Q.  I can't tell if you are asking me a
8  question or if you are telling me something.  Are
9  you saying if Abbott is no longer interested in
10 the idea, then Abbott no longer owns them?  Is
11 that your position?
12     A.  Yes, maybe.
13     Q.  You have to tell me yes or no.  Do you
14 take the position that if Abbott said it wasn't
15 interested in the ideas, then Abbott no longer
16 owns the ideas?
17     A.  Yes.
18     Q.  So you believed then that you had the
19 right to take these 32 projects and patent them
20 in your own name?
21     A.  Whether Abbott patents these ideas or I
22 patent these ideas myself, I am still the sole
23 inventor of these ideas.
24     Q.  What I am asking is what you meant.  In

ETTA R. JONES, C.S.R. - (773) 459-4111

112

1  this you don't talk about Abbott patenting them.
2  You are talking about you are going to patent
3  yourself.  I am taking all of my 32 project ideas
4  with me and patent them myself.  Do you see that?
5      A.  Yes.
6      Q.  That's what you wrote, correct?
7      A.  Yes, because they told me not to contact
8  Abbott attorneys.
9      Q.  So you felt then that gave you the right
10 to patent them yourself in your own name?
11     A.  Yes.  They told me Abbott was not
12 interested in these ideas.  Abbott was not
13 interested in developing these ideas.  I couldn't
14 ask any questions about any of my ideas, and I
15 could not contact any of the Abbott patent
16 attorneys.  That's what they said to me.  So what
17 should I do with these ideas?  Can I just take
18 them with me?
19     Q.  Your memo was not asking a question,
20 right?  You were not asking him what to do.  You
21 were telling him what you were going to do, which
22 was take them and patent them yourself?
23     A.  Yes, based on the other emails they sent
24 to me.

ETTA R. JONES, C.S.R. - (773) 459-4111

218

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
 3               NORTHERN DISTRICT OF ILLINOIS
 4                      EASTERN DIVISION
 5
 6   DIEP X. HOANG,            )
                               )
 7        Plaintiff,           )
                               )
 8        vs.                  )  No. 03 C 2910
                               )
 9   ABBOTT LABORATORIES, INC., )
     KATHERINE GREEN, KENNETH A. )
10   WILSON, AND MAURIZIO      )
     ACQUASALIENTE,            )
11                             )
          Defendants.          )
12
13          The continued deposition of
14   DIEP X. HOANG, taken before ETTA R. JONES, Notary
15   Public, pursuant to the Federal Rules of Civil
16   Procedure for the United States District Courts
17   pertaining to the taking of depositions at 100
18   West Monroe Street, Suite 1700, in the City of
19   Chicago, Cook County, Illinois, on the 14th day
20   of April, A.D., 2006, commencing at the hour of
21   10:00 o'clock a.m.
22
23
24
           ETTA R. JONES, C.S.R. - (773) 459-4111
```

219

```
 1   APPEARANCES:
 2
 3        ANDREWS, KOEHLER & PASSARELLI, P.C., by
 4        MR. GREGORY H. ANDREWS
 5        4343 Commerce Court, Suite 615
 6        Lisle, Illinois  60532
 7        (630) 505-9939
 8             Representing the Plaintiff;
 9
10        BROTHERS & THOMPSON, P.C., by
11        MR. HUBERT O. THOMPSON
12        100 West Monroe Street, Suite 1700
13        Chicago, Illinois  60603
14        (312) 372-2909
15             Representing the Defendants.
16
17
18
19
20
21
22
23
24
           ETTA R. JONES, C.S.R. - (773) 459-4111
```

220

```
 1                   I N D E X
 2   EXAMINATION OF DIEP X. HOANG              PAGE
 3        BY MR. THOMPSON                       222
 4
 5
 6
 7
 8
 9
10
11
12
13        EXHIBITS MARKED FOR IDENTIFICATION
14   Hoang Deposition Exhibit Nos. 20 - 34      223
15
16
17
18
19
20
21
22
23
24
           ETTA R. JONES, C.S.R. - (773) 459-4111
```

221

```
 1        MR. THOMPSON:  Swear the witness.
 2             (WHEREUPON, the witness was
 3              duly sworn.)
 4        MR. THOMPSON:  Ms. Hoang, this is the
 5   continued deposition of you for purposes of your
 6   lawsuit in this case, Diep X. Hoang versus Abbott
 7   Laboratories, et al.
 8             I want to remind you of the
 9   rules we talked about last time.  I will be
10   asking you questions.  Please keep your voice up.
11   Please speak so that the court reporter can hear
12   you.  Please answer audibly.  Nodding, shaking
13   your head, unh-unh, unh-huh will not be
14   transcribed correctly.  If you could just answer
15   yes, no, I don't know, that would be very
16   helpful.
17             If you do not understand a
18   question that I ask you, please let me know.  I
19   will then rephrase the question, put it in a way
20   that you can understand it.
21             If I ask you a question and you
22   answer the question, I will assume that you heard
23   the question, you understood the question and
24   that your answers are responsive directly to the
           ETTA R. JONES, C.S.R. - (773) 459-4111
```

250

1    A. Do I know if he applied for the
2    promotion?  I am sorry.
3    Q. Do you know if Mark Labrador applied to
4    be promoted to supervisor in production?
5    A. Yes.
6    Q. He applied and you did not apply; is
7    that right?
8    A. Correct, because it was announced
9    through the whole department.
10   Q. I am sorry.
11   A. Because it was announced through the
12   whole department.
13   Q. What was announced?
14   A. Mark Labrador got a new job, promotion.
15   Q. Okay.
16   A. That's how I learned of it.
17   Q. Do you know who else applied for that
18   position that Mark Labrador received?
19   A. No, I don't, but he got the same
20   bachelor of science that I got.  He had no
21   experience.
22   Q. Do you know who made the decision to
23   promote Mark Labrador?
24   A. No, I don't.

ETTA R. JONES, C.S.R. - (773) 459-4111

251

1    Q. Turn to page 5.  Page 5 lists Abbott
2    Labs, Kenneth Wilson, Maurizio Acquasaliente and
3    Katherine Green with regard to disability
4    discrimination; is that correct?
5    A. Yes.
6    Q. You believe Abbott Laboratories and
7    these individuals discriminated against you based
8    upon your disability; is that right?
9    A. Yes.
10   Q. What did Kenneth Wilson do that you
11   believe was discriminatory to you based on your
12   disability?
13   A. He forced me to attend department
14   meetings, and in department meetings there were
15   Clari people and I was too sick.  I could not
16   face the Clari people.
17   Q. Anything else?
18   A. Because I had -- at that time I had
19   posttrauma stress disorder.
20   Q. Anything else that he did that you
21   believe is discrimination against you based upon
22   disability?
23       MR. ANDREWS:  Other than what she has
24   answered in the interrogatory?

ETTA R. JONES, C.S.R. - (773) 459-4111

252

1        MR. THOMPSON:  Right, in addition.
2    BY MR. THOMPSON:
3    Q. Other than what's on this page, anything
4    else that he did that you believe constituted
5    discrimination based upon disability?
6    A. He forced me to attend one-on-one with
7    Maurice Acquasaliente.
8    Q. Anything else?
9    A. And he forced me to give up all my
10   inventions.
11   Q. When you say give up all your
12   inventions, do you mean he told you you couldn't
13   work on them anymore?
14   A. Correct.
15   Q. Anything else?
16   A. Yes.  He told me to not ask any
17   questions.
18   Q. Okay.  Anything else?
19   A. That's all I can remember now.
20   Q. Okay.  That was Kenneth Wilson.
21       With regard to Maurizio
22   Acquasaliente, can you identify what you believe
23   to be his acts of discrimination against you
24   based upon your disability?

ETTA R. JONES, C.S.R. - (773) 459-4111

253

1    A. I am sorry.  That question again?
2    Q. How did Maurizio discriminate against
3    you based upon your disability?
4        MR. ANDREWS:  Is that in addition to
5    what's here in the answer?
6        MR. THOMPSON:  I am assuming that this
7    is her answer.
8    BY MR. THOMPSON:
9    Q. In addition to this, how did Maurizio
10   discriminate against you based upon your
11   disability?
12   A. Maurizio tried to force me to meet one
13   on one with him when I had -- I still had
14   posttrauma stress disorder at that time.
15   Q. Anything else?
16   A. He was withholding information when I
17   asked about Clari ideas, inventions.
18   Q. Anything else?
19   A. He warned the scientist at DOR for my
20   invention.
21   Q. Anything else?
22   A. He kept me in the office and forced me
23   to give up my invention to him.
24   Q. When did that occur?

ETTA R. JONES, C.S.R. - (773) 459-4111

**254**

1  A. November.
2  Q. November 2001?
3  A. Correct. Three times.
4  Q. Anything else?
5  A. I am sorry. Ken Wilson also kept me in
6  the office and forced me to give up all the
7  inventions.
8  Q. Anything else that Kenneth Wilson or
9  Maurizio Acquasaliente did that you believe
10  constitutes disability discrimination?
11  A. At this particular time?
12  Q. I mean at any time in the history of the
13  world. Anything that Kenneth Wilson and Maurizio
14  Acquasaliente did to you that you believe
15  constituted disability discrimination.
16  A. Yes. In 1998 he took my ideas.
17  Q. Who?
18  A. Maurizio.
19  Q. Okay.
20  A. He took my ideas. He worked behind my
21  back without my knowledge, and he presented my
22  ideas and my data in my face.
23  Q. How do you believe that constitutes
24  disability discrimination?

ETTA R. JONES, C.S.R. - (773) 459-4111

**255**

1  A. It was a blow to me. I was devastated.
2  Q. Is that the reason you believe that's
3  disability discrimination?
4  A. Yes. I became very sick.
5  Q. Anything else?
6  A. He broke my glasswares. He purposely
7  did.
8  Q. You think breaking your glassware
9  constituted disability discrimination?
10  A. Yes.
11  Q. Why is that?
12  A. Because it gave me stress.
13  Q. You believe anything that gives you
14  stress is disability discrimination?
15  A. Yes.
16  Q. Anything else that Maurizio did?
17  A. That's all I can remember now.
18  Q. What about Katherine Green? Same
19  question. What did she do that you believe
20  constituted disability discrimination in addition
21  to the things that are written here on this
22  interrogatory?
23  A. She kept me in the office with Ken
24  Wilson and Maurizio Acquasaliente.

ETTA R. JONES, C.S.R. - (773) 459-4111

**256**

1  Q. Why did that constitute disability
2  discrimination?
3  A. At that time I was -- I had posttrauma
4  stress disorder and I was very sick, and she told
5  me three things that she wanted me to do. The
6  first thing was to call Maurizio Acquasaliente
7  whenever I was out sick instead of calling the
8  secretary.
9  Q. Do you believe that was discriminatory?
10  A. Yes.
11  Q. Why?
12  A. Because the whole department --
13  everybody called the secretary and the secretary
14  will send the e-mail to the whole department to
15  inform the whole department that this person
16  would be -- was out sick.
17  Q. Okay.
18  What else?
19  A. She forced me to call Maurizio instead
20  of calling the secretary.
21  Q. Okay. What else?
22  A. The second thing is she forced me to
23  attend department meeting where I had to face the
24  Clari people.

ETTA R. JONES, C.S.R. - (773) 459-4111

**257**

1  Q. What else?
2  A. And she forced me to attend one-on-one
3  meeting with Maurizio Acquasaliente.
4  Q. Maurizio was your direct supervisor at
5  the time, correct?
6  A. Correct.
7  Q. How was forcing you to attend one-on-one
8  meetings with your direct supervisor disability
9  discrimination?
10  A. Because at that time I still had trauma.
11  I still had the posttrauma stress disorder of the
12  Clari people, what they did to me.
13  Q. Is your answer complete?
14  A. Maurizio came from Clari Group.
15  Q. Yes.
16  Anything else with regard to
17  Katherine Green that she did that you believe
18  constituted disability discrimination?
19  A. Yes. She forced me to give up all my 32
20  project ideas, and she said I could not work on
21  my ideas. I had to give up all my ideas to the
22  Clari people to work on.
23  Q. Do you believe that Abbott Laboratories,
24  your employer, did not have the right to tell you

ETTA R. JONES, C.S.R. - (773) 459-4111

258

1  what to work on?
2      A.  I am sorry.
3      Q.  Abbott was your employer, correct?
4      A.  Right.
5      Q.  Don't you believe that Abbott had the
6  right to tell you what Abbott wanted you to work
7  on and what Abbott did not want you to work on?
8      A.  Correct.
9      Q.  So her telling you that you were to not
10 work on these things in Clari Group since you
11 were no longer in Clari Group but you were to
12 work on other things, don't you believe that was
13 something Abbott had the right to tell you?
14     A.  But --
15     Q.  Do you believe Abbott had the right to
16 tell you what to work on and what not to work on
17 since you were being paid as an Abbott employee?
18     A.  Yes, but I went to see one of the patent
19 attorneys.  His name is Tom Brenaid, B-r-a-t-n --
20 B-r-e-n-a-i-d.
21     Q.  Okay.
22     A.  I came to see him.  I told him that I
23 had some ideas which were benefit to Abbott
24 Laboratories.

              ETTA R. JONES, C.S.R. - (773) 459-4111

259

1      Q.  When you say a patent attorney, was this
2  an Abbott employee?
3      A.  Yes.
4      Q.  So he was a patent attorney employed by
5  Abbott Laboratories?
6      A.  Correct.
7      Q.  All right.
8      A.  He said if your boss did not let you
9  work on your ideas, come to me and tell me.
10     Q.  Did you communicate with him in writing
11 or on the phone?
12     A.  I came to meet him in his office.
13     Q.  But did you commune -- did you send
14 e-mails to him?
15     A.  At that time I did not send him e-mail.
16 I just call and make appointment to come and see
17 him.
18     Q.  What happened when you went to see him?
19     A.  He told me, if your boss did not let you
20 work on your ideas, which were benefit to --
21 beneficial to Abbott, you come and tell me.
22     Q.  Did he tell you anything else?
23     A.  He told me to -- if you get good
24 results, you come to see me.

              ETTA R. JONES, C.S.R. - (773) 459-4111

260

1      Q.  Is there anything else that he told you?
2      A.  No, that's it.
3      Q.  So after Katherine Green told you that
4  you were no longer to work on your 32 ideas, did
5  you go back to see Tom Brenaid, the patent
6  attorney?
7      A.  At that time I was still working on
8  Ritonavir Lopinavir project.  I came up with a
9  list, 16, 17 projects from Ritonavir Lopinavir.
10     Q.  Ms. Hoang, you are not responding to my
11 question.
12         You testified that Katherine
13 Green told you that you could not work on the
14 projects that you had from the Clari Group.
15     A.  Right.
16     Q.  You also testified that Tom Brenaid told
17 you that if your supervisors told you that you
18 couldn't work on the projects, that they weren't
19 interested in them, you were to come back and see
20 him.
21     A.  He left Abbott at that time.
22     Q.  So you didn't go back to see him because
23 he left?
24     A.  Right.

              ETTA R. JONES, C.S.R. - (773) 459-4111

261

1      Q.  Is that right?
2      A.  32 projects included the Ritonavir
3  Lopinavir projects.  So there were like about 17
4  of Clari and 14 of Ritonavir Lopinavir, and one
5  of aminoglycoside, an antibiotic.
6      Q.  Now, is there anything else that
7  Katherine Green did to you that you believe
8  constitutes disability discrimination?
9      A.  She did not let me leave the room.
10     Q.  Anything else?
11     A.  She forced me to sit down and agree
12 before I could leave the room.
13     Q.  Agree to what?
14     A.  Agree to give up all my inventions.
15     Q.  Anything else?
16     A.  That's it.
17     Q.  You have listed these people here who
18 you claim dis --
19     A.  I believe that Steve Montgomery was
20 behind this.
21     Q.  When you say behind this, what do you
22 mean?
23     A.  Because he was the leader of Clari
24 people.

              ETTA R. JONES, C.S.R. - (773) 459-4111

**262**

1  Q. I am sorry. Who told you that Steve
2  Montgomery was behind this?
3  A. I believe that he is behind it.
4  Q. That's not my question. My question is
5  who told you. Who said to you Steve Montgomery
6  is behind this?
7  A. Mel Hodkinson never did anything like
8  this to me when I was in the Clari, and when I
9  was --
10  Q. Ms. Hoang, your testimony, unsolicited,
11  was you believe Steve Montgomery was behind this.
12  I assume you are talking about Ken Wilson,
13  Maurizio Acquasaliente and Katherine Green's
14  disability discrimination. Is that what you are
15  talking about?
16  A. Yes.
17  Q. Who told you that? Did Ken Wilson tell
18  you Steve Montgomery was behind this?
19  A. It was Steve Montgomery --
20  Q. Excuse me, Ms. Hoang.
21  MR. ANDREWS: She hasn't testified
22  that anyone told her. She said she had a belief.
23  You can ask her what her belief was.
24  MR. THOMPSON: Or I can ask did anyone
ETTA R. JONES, C.S.R. - (773) 459-4111

**263**

1  tell you, and I haven't gotten an answer.
2  BY MR. THOMPSON:
3  Q. Did anyone at Abbott Laboratories tell
4  you that Steve Montgomery was behind Maurizio
5  Acquasaliente, Katherine Green or Ken Wilson?
6  A. When I asked questions, they refused to
7  answer my question.
8  Q. Who did you ask if Steve Montgomery was
9  behind the disability discrimination?
10  A. Because he was the leader of the Clari.
11  Q. I am sorry, Ms. Hoang. You are not
12  answering my question.
13  Who did you ask? Who did you
14  ask? Did you ask Kenneth Wilson? Did you ask
15  Maurizio? Did you ask Katherine Green if Steve
16  Montgomery was behind the disability
17  discrimination?
18  A. I did not ask them.
19  Q. You did not ask them?
20  A. I believe he was behind them.
21  Q. I understand you believe it. I am
22  trying to understand. It is not because anyone
23  told you that, right? No one told you that Steve
24  Montgomery was behind --
ETTA R. JONES, C.S.R. - (773) 459-4111

**264**

1  A. But they showed --
2  Q. Excuse me, Ms. Hoang. Let me ask a
3  question, and then I want you to give an answer.
4  Did Kenneth Wilson, Maurizio
5  Acquasaliente or Katherine Green tell you that
6  Steve Montgomery was behind the disability
7  discrimination?
8  A. No.
9  Q. Did anyone at Abbott tell you that Steve
10  Montgomery was behind the disability
11  discrimination that you suffered at Abbott? Did
12  anyone?
13  A. Mel Hodkinson said Steve said I was
14  already dead, no longer in the Clari.
15  Q. When was that?
16  A. February 3, 19 -- I think February 4,
17  1999.
18  Q. Now, that was in 1999. This answer
19  refers to early in 2001.
20  A. Yes.
21  Q. My question is did anybody tell you with
22  regard to 2001 that Steve Montgomery was behind
23  the disability discrimination?
24  A. No one told me, but they show by action.
ETTA R. JONES, C.S.R. - (773) 459-4111

**265**

1  They didn't tell me directly, but they showed me
2  by actions.
3  Q. What were their actions?
4  A. When I asked about my ideas, no one --
5  they were told not to answer my questions.
6  Q. Who told them not to answer your
7  questions?
8  A. Ken Wilson.
9  Q. Not Steve Montgomery? Ken Wilson told
10  them not to answer your question?
11  A. Steve Montgomery told Ken Wilson.
12  Q. How do you know that?
13  A. I believe.
14  Q. I understand that's your belief. I am
15  trying to understand the basis for your belief.
16  What is the basis for it? Did anybody tell you
17  that Steve Montgomery told Ken Wilson that?
18  A. He was my department manager. He
19  supposed to help me.
20  Q. That's not my question, Ms. Hoang. You
21  said you believe that Steve Montgomery told Ken
22  Wilson to tell other people not to answer your
23  questions. My question to you is what is the
24  basis for that belief?
ETTA R. JONES, C.S.R. - (773) 459-4111

266

```
1      A.  He steal my idea.
2      Q.  I am sorry.
3      A.  They steal my ideas.  They steal my
4   credits.
5      Q.  That doesn't answer my question.
6          Did anybody tell you that Steve
7   Montgomery told Ken Wilson to tell other people
8   not to answer your questions?
9      A.  That's what my belief is.
10     Q.  Did anybody tell you that?
11     A.  No.
12     Q.  Did you see anything in writing from
13  Steve Montgomery to Ken Wilson telling him to
14  tell other people not to answer your questions?
15     A.  No.
16     Q.  Did Ken Wilson work for Steve
17  Montgomery?
18     A.  Under -- Steve Montgomery was under Ken
19  Wilson.
20     Q.  So Ken Wilson didn't report to Steve
21  Montgomery?
22     A.  Of course not.
23     Q.  Steve Montgomery reported up to Ken
24  Wilson, correct?
```

ETTA R. JONES, C.S.R. - (773) 459-4111

267

```
1      A.  Correct, but Steve Montgomery influence
2   people.
3      Q.  I am sure he did.
4          MR. THOMPSON:  Why don't we take a
5   break.
6          (WHEREUPON, a recess was
7                taken.)
8   BY MR. THOMPSON:
9      Q.  Ms. Hoang, let me direct your attention
10  to page 12, specifically, interrogatory number 9.
11  Interrogatory number 9 asks, state all bases for
12  plaintiff's retaliation claim against Abbott.  Do
13  you see that?
14     A.  Yes.
15     Q.  Then you start your answer talking about
16  as early as 1999.  Do you see that?
17     A.  Yes.
18     Q.  What did you do in 1999 or earlier that
19  caused Abbott to retaliate against you?  Why do
20  you believe Abbott was retaliating against you in
21  1999?
22     A.  Can you ask the question again.
23     Q.  Yes.
24          Your answer to this
```

ETTA R. JONES, C.S.R. - (773) 459-4111

268

```
1   interrogatory states that retaliation by Abbott
2   against plaintiff began as early as 1999.  Do you
3   see that?
4      A.  Yes.
5      Q.  Why do you believe Abbott was
6   retaliating against you in 1999?
7      A.  I didn't know who wrote my performance
8   evaluation.  Steve Montgomery wrote my
9   performance evaluation, and it was a poor
10  performance evaluation.
11     Q.  Okay.  So you believe that the
12  performance evaluation that you received in 1999
13  was retaliation?
14     A.  Yes.
15     Q.  Retaliation against you?
16     A.  Yes.
17     Q.  For what?  Why was Abbott retaliating
18  against you in 1999?  What had you done that
19  would make Abbott retaliate against you?
20     A.  Steve Montgomery influenced.  Steve was
21  the leader of Clari, and he influenced other
22  managers because he said that more than one
23  person wrote my performance evaluation for 1999.
24     Q.  Okay.
```

ETTA R. JONES, C.S.R. - (773) 459-4111

269

```
1          My question is what actions had
2   you taken that resulted in Abbott wanting to
3   retaliate against you?
4      A.  What actions?
5      Q.  Yes.
6          You said that Steve Montgomery
7   was retaliating against you or whoever wrote your
8   evaluation in 1999 was retaliating against you.
9   What had you done?  Why was Steve Montgomery or
10  other people retaliating against you?
11     A.  Because I said no to Steve Montgomery,
12  so he retaliated.
13     Q.  Anything else?
14     A.  He fire me.
15     Q.  Who fired you?
16     A.  Steve Montgomery.
17     Q.  When?
18     A.  2002.
19     Q.  How do you know that he fired you in
20  2002?
21     A.  He wanted to take my credits.
22     Q.  I don't want to know what you think he
23  thought.  I want to know how do you know that
24  Steve Montgomery was the person at Abbott
```

ETTA R. JONES, C.S.R. - (773) 459-4111

**278**

```
1    Q. Are you claiming that you did something
2  that caused Abbott and these other people who
3  work for Abbott to retaliate against you?
4    A. Yes.
5    Q. What did you do that they were
6  retaliating against you?
7    A. I came up with new idea and invention,
8  and it was a threaten (sic) for them.
9    Q. It was a threaten?
10   A. A threaten.
11   Q. It was threatening to them?
12   A. Yes.
13   Q. Anything else?
14   A. They wanted to take my credit.
15   Q. You came up with new ideas and
16  inventions, and it was threatening to Abbott and
17  Abbott wanted to take credit for your ideas; is
18  that right?
19   A. The people, the Clari people.
20   Q. The Clari people wanted to take credit
21  for your ideas?
22   A. Yes, but they have influence on
23  management.
24   Q. As a result of that, you believe these
```
ETTA R. JONES, C.S.R. - (773) 459-4111

**279**

```
1  people retaliated against you?
2    A. Yes.
3    Q. Is there anything else that you did that
4  you believe was -- resulted in these people
5  retaliating against you?
6    MR. ANDREWS: Other than the ones she
7  testified to earlier? That's been asked and
8  answered earlier.
9    MR. THOMPSON: I have not heard any
10  answer to this question other than what she is
11  saying now with regard to Clari people.
12  BY MR. THOMPSON:
13   Q. My question to you, Ms. Hoang, is what
14  did you do that resulted in the Clari people,
15  Katherine Green, anybody else, retaliating
16  against you at Abbott?
17   A. What did I do?
18   Q. Yes. You told me about the ideas, that
19  they were trying to steal your ideas, that they
20  felt threatened by your ideas. What else did you
21  do?
22   A. I did nothing. Katherine Green,
23  Kenneth Wilson and Maurizio is involved in firing
24  me.
```
ETTA R. JONES, C.S.R. - (773) 459-4111

**280**

```
1    Q. Katherine Green?
2    A. Yes.
3    Q. Who else?
4    A. Kenny Wilson and Maurizio Acquasaliente
5  was involved in firing me.
6    Q. How do you know that Kathy Green was
7  involved in firing you?
8    A. How do I know?
9    Q. Yes, ma'am. How do you know?
10   A. Because they tried to take --
11   Q. I am talking about one person, Kathy
12  Green. How do you know that Kathy Green was
13  involved in firing you?
14   A. Because she didn't get what she wanted.
15   Q. What did she want?
16   A. She wanted to take all my 32 projects.
17   Q. She wanted to take all of your 32
18  projects. She didn't get them?
19   A. Without crediting to me.
20   Q. And how do you know that she then became
21  involved in firing you?
22   A. Because she is from HR sent by Cindy
23  Perez.
24   Q. I am sorry. Now you are talking about
```
ETTA R. JONES, C.S.R. - (773) 459-4111

**281**

```
1  Cindy Perez.
2       What evidence do you have that
3  Kathy Green was involved in firing you?
4    A. She compile a file about me, about --
5  can you ask the question.
6    Q. How do you know Kathy Green was involved
7  in firing you?
8    A. How did I know?
9    Q. Yes.
10   A. I believe so.
11   Q. I understand that's your belief. My
12  question is what is the basis for your belief.
13  What facts do you have? What evidence do you
14  have to support your belief that Kathy Green was
15  involved in firing you?
16   A. She was from HR.
17   Q. So you believe HR was involved in firing
18  you?
19   A. Yes.
20   Q. What is the basis of that belief?
21   A. They had the power.
22   Q. Any other thing? Any other basis for
23  your belief that Kathy Green was involved in
24  firing you?
```
ETTA R. JONES, C.S.R. - (773) 459-4111

**311**

```
 1
 2              IN THE UNITED STATES DISTRICT COURT
 3                 NORTHERN DISTRICT OF ILLINOIS
 4                       EASTERN DIVISION
 5
 6   DIEP X. HOANG,              )
                                 )
 7            Plaintiff,         )
                                 )
 8      vs.                      ) No. 03 C 2910
                                 )
 9   ABBOTT LABORATORIES, INC.,  )
     KATHERINE GREEN, KENNETH A. )
10   WILSON, AND MAURIZIO        )
     ACQUASALIENTE,              )
11                               )
              Defendants.        )
12
13            The continued deposition of
14   DIEP X. HOANG, taken before ETTA R. JONES, Notary
15   Public, pursuant to the Federal Rules of Civil
16   Procedure for the United States District Courts
17   pertaining to the taking of depositions at 100
18   West Monroe Street, Suite 1700, in the City of
19   Chicago, Cook County, Illinois, on the 5th day of
20   May, A.D., 2006, commencing at the hour of 10:00
21   o'clock a.m.
22
23
24
          ETTA R. JONES, C.S.R. - (773) 459-4111
```

**312**

```
 1   APPEARANCES:
 2
 3       ANDREWS, KOEHLER & PASSARELLI, P.C., by
 4       MR. GREGORY H. ANDREWS
 5       4343 Commerce Court, Suite 615
 6       Lisle, Illinois  60532
 7       (630) 505-9939
 8            Representing the Plaintiff;
 9
10       BROTHERS & THOMPSON, P.C., by
11       MR. HUBERT O. THOMPSON
12       100 West Monroe Street, Suite 1700
13       Chicago, Illinois  60603
14       (312) 372-2909
15            Representing the Defendants.
16
17
18
19
20
21
22
23
24
          ETTA R. JONES, C.S.R. - (773) 459-4111
```

**313**

```
 1                    I N D E X
 2   EXAMINATION OF DIEP X. HOANG            PAGE
 3       BY MR. THOMPSON                      314
 4       BY MR. ANDREWS:                      397
 5       BY MR. THOMPSON:                     427
 6
 7
 8
 9
10       EXHIBITS MARKED FOR IDENTIFICATION
11   Hoang Deposition Exhibit No. 35         382
12   Hoang Deposition Exhibit No. 36         384
13   Hoang Deposition Exhibit No. 37         386
14   Hoang Deposition Exhibit No. 38         387
15   Hoang Deposition Exhibit No. 39         388
16   Hoang Deposition Exhibit No. 40         391
17   Hoang Deposition Exhibit No. 41         396
18   Hoang Deposition Exhibit No. 42         414
19   Hoang Deposition Exhibit No. 43         415
20   Hoang Deposition Exhibit No. 44         416
21   Hoang Deposition Exhibit No. 45         417
22   Hoang Deposition Exhibit No. 46         418
23   Hoang Deposition Exhibit No. 47         419
24
          ETTA R. JONES, C.S.R. - (773) 459-4111
```

**314**

```
 1            (WHEREUPON, the witness was
 2            duly sworn.)
 3        MR. THOMPSON:  This is the continued
 4   deposition of Diep Hoang.
 5            DIEP X. HOANG,
 6   called as a witness herein, having been first
 7   duly sworn, testified upon oral interrogatories
 8   as follows:
 9            E X A M I N A T I O N
10   BY MR. THOMPSON:
11        Q.  Ms. Hoang, are you taking any medication
12   today that would affect your ability to testify
13   truthfully or honestly?
14        A.  No.
15        Q.  Are you suffering from any medical
16   condition that would affect your ability to
17   testify truthfully and honestly today?
18        A.  No.
19        Q.  When we stopped last time, I was asking
20   you questions about your relationship with
21   Mr. Steve Montgomery.  I would like to start
22   there today.
23            Ms. Hoang, was Steve Montgomery
24   ever your direct supervisor?
          ETTA R. JONES, C.S.R. - (773) 459-4111
```

**375**

```
1    report to human resource.  And then the second
2    time I talked to an attorney on the phone.  The
3    attorney told me to report to human resources.
4        Q.  So the March 2001 meeting, was that the
5    meeting in which you reported to human resources
6    the threatening -- strike that -- reported to
7    human resources the sexual harassment?
8        A.  Yes.
9        Q.  That was with Laura Song, correct?
10       A.  Yes.
11       Q.  After that meeting with Laura Song, how
12   long was it that you had another meeting with
13   Laura Song?
14       A.  I think the second one was in April of
15   2001.
16       Q.  What happened in that meeting?
17       A.  I told her about the sexual harassment,
18   and I asked her why did -- I was the only person
19   that got moved out the Clari Group.  I asked her
20   why I could not work on my ideas when I had ideas
21   that were beneficial to the company.  I asked her
22   why I couldn't work on my ideas but other people
23   work on my ideas because I wanted the credit in
24   order to advance in my career at Abbott.
```
             ETTA R. JONES, C.S.R. - (773) 459-4111

**376**

```
1        Q.  Anything else?
2        A.  That's all.
3        Q.  What did she say to you?
4        A.  She didn't get back to me.  She didn't
5    respond to those questions.
6        Q.  Were these questions oral or were they
7    in writing?
8        A.  I was telling her at that time.  She was
9    taking some notes --
10       Q.  So --
11       A.  -- at the same time.
12       Q.  So did you hear from her again?
13       A.  I met with her the third time.  I asked
14   her why I was underpaid.  I asked her why had
15   another person in the same group, same
16   department, actually same department -- he was a
17   male.  I didn't tell her the name, but it was
18   Mark Labrador.
19       Q.  L-a-b-r-a-d-o-r?
20       A.  Yes.
21       Q.  What did you ask her about Mark
22   Labrador?
23       A.  I ask her how come this person have the
24   same bachelor of science in biology degree that I
```
             ETTA R. JONES, C.S.R. - (773) 459-4111

**377**

```
1    had and he had no experience but he came in grade
2    level 13 and he got paid $45,000 a year.
3        Q.  How did you know what he was paid?
4        A.  Because he show it to Ramesh Patel, and
5    Ramesh Patel told me.
6        Q.  P-a-t-e-l?
7        A.  Yes.
8        Q.  What's the first name?
9        A.  R-a-m-e-s-h.
10       Q.  Who is or was Ramesh Patel?
11       A.  He was a co-worker from another
12   department.
13       Q.  So Mark Labrador showed Mr. Patel --
14       A.  His check stub.
15       Q.  Then Mr. Patel told you or showed you?
16       A.  Told me.
17       Q.  But you did not tell Laura Song Mark
18   Labrador's name, correct?
19       A.  Yes.
20       Q.  Yes?
21       A.  No, I did not tell her the name.
22       Q.  So you asked her why you were being
23   underpaid and why somebody else was being paid
24   more; is that right?
```
             ETTA R. JONES, C.S.R. - (773) 459-4111

**378**

```
1        A.  Yes, and he was a male and I was a
2    female.
3        Q.  Anything else you recall about that
4    meeting?
5        A.  That's all.
6        Q.  Was that meeting just you and Laura
7    Song?
8        A.  Yes.
9        Q.  Were all of your meetings with Laura
10   Song just you and she?
11       A.  Yes.
12       Q.  Did you ever meet with Laura Song along
13   with Cindy Perez?
14       A.  The next time -- it was in probably
15   August or summer of 2001 that I met with Laura
16   Song and Cindy Perez.
17       Q.  What happened in that meeting?
18       A.  She told me that --
19       Q.  Which she?
20       A.  Laura Song told me that Cindy Perez was
21   the director of human resources, and I told Cindy
22   Perez exactly what I told Laura Song.
23       Q.  Did Cindy Perez tell you she had met
24   with Steve Montgomery?
```
             ETTA R. JONES, C.S.R. - (773) 459-4111

383

```
1              (WHEREUPON, a brief pause
2                   was taken.)
3   BY MR. THOMPSON:
4       Q.  You have had a chance to review that?
5       A.  Yes.
6       Q.  What is Exhibit Number 35?  Do you
7   recognize it?
8       A.  Yes.
9       Q.  Did you write it?
10      A.  Yes, I did.
11      Q.  Now, did you send this to -- strike
12  that.
13              What is Exhibit 35?
14      A.  It is about -- I told him not to follow
15  me anywhere anymore and not to come to my
16  cubicle.
17      Q.  Is this a note you wrote to Steve
18  Montgomery?
19      A.  Yes, I did.
20      Q.  Did you write it on or about April 16,
21  1999?
22      A.  Yes, I did.
23      Q.  Was there a particular reason you wrote
24  this?
           ETTA R. JONES, C.S.R. - (773) 459-4111
```

384

```
1       A.  Because after the oral sex, I told him
2   that I did not want it to continue anymore.
3       Q.  Did he respond to this at all?
4       A.  I don't remember.
5       Q.  Did you actually send this note to him?
6       A.  Yes.
7       Q.  How did you send it?
8       A.  I put it in his mailbox.  Actually, I
9   gave it to him.  I don't remember exactly.
10      Q.  So you don't remember how he received
11  it?
12      A.  Yes.
13      Q.  But you do believe that you gave this to
14  him?
15      A.  Yes, I did.
16          MR. THOMPSON:  36.
17              (WHEREUPON, Hoang Deposition
18              Exhibit Number 36 was marked
19              for identification.)
20          MR. THOMPSON:  Take a moment to review
21  Exhibit 36, please.
22              (WHEREUPON, a brief pause
23                  was taken.)
24          THE WITNESS:  Yes.
           ETTA R. JONES, C.S.R. - (773) 459-4111
```

385

```
1   BY MR. THOMPSON:
2       Q.  You reviewed it?
3       A.  Yes.
4       Q.  Can you identify Exhibit 36?
5       A.  Yes.  This is about -- after I came back
6   from my leave of absence, this is a memo that I
7   wrote to myself.
8       Q.  This memo is dated June 16, 1999,
9   correct?
10      A.  Yes.
11      Q.  This is from you to you, right?
12      A.  Yes.
13      Q.  This is regarding what happened back in
14  February of 1999, correct?
15      A.  Correct.
16      Q.  Did you share this e-mail with anyone?
17      A.  No.
18      Q.  Why did you write it?
19      A.  For record.
20          MR. THOMPSON:  Let's mark this Exhibit
21  37.
22              (WHEREUPON, Hoang Deposition
23              Exhibit Number 37 was marked
24              for identification.)
           ETTA R. JONES, C.S.R. - (773) 459-4111
```

386

```
1          MR. THOMPSON:  I want you to take a
2   look at Exhibit 37, specifically the e-mail at
3   the bottom.
4              (WHEREUPON, a brief pause
5                  was taken.)
6          THE WITNESS:  Yes.
7   BY MR. THOMPSON:
8       Q.  Have you had a chace to review that?
9       A.  Yes.
10      Q.  At the bottom of Exhibit 37, is that an
11  e-mail from you to Elspeth J. Gray?
12      A.  Yes.
13      Q.  Why did you write this to Elspeth J.
14  Gray?
15      A.  Because Steve Montgomery sent -- told
16  Elspeth Gray to send e-mails to me to take my
17  inventions away from me, my ideas away from me.
18      Q.  Why don't you read into the record what
19  you said.
20      A.  You want me to read it?
21      Q.  Yes, the bottom, what you wrote.
22      A.  I am sorry that Steve Montgomery is not
23  my manager and I am still in charge of my work.
24          MR. THOMPSON:  Mark this 38, please.
           ETTA R. JONES, C.S.R. - (773) 459-4111
```

387

```
1              (WHEREUPON, Hoang Deposition
2              Exhibit Number 38 was marked
3              for identification.)
4         MR. THOMPSON: Ms. Hoang, I have
5    handed you a document we have marked as Exhibit
6    Number 38. It is a series of e-mails. They are
7    Bates label PL000079 and PL000079.1. You read
8    these in reverse order, so the first e-mail would
9    be on the first page at the bottom coming up.
10   Take a moment to review those.
11             (WHEREUPON, a brief pause
12             was taken.)
13   BY MR. THOMPSON:
14        Q. Have you had a chance to review them?
15        A. Yes.
16        Q. Is this a series of e-mails between
17   yourself and Steve Montgomery in March of 2001?
18        A. Yes.
19        Q. The first e-mail is an e-mail that you
20   wrote to him on December 19, 2000, on the bottom
21   of page 79.1; is that right?
22        A. Yes.
23        MR. THOMPSON: Let's take a short
24   recess.
          ETTA R. JONES, C.S.R. - (773) 459-4111
```

388

```
1              (WHEREUPON, a recess was
2              taken.)
3         MR. THOMPSON: This would be 39, I
4    believe.
5              (WHEREUPON, Hoang Deposition
6              Exhibit Number 39 was marked
7              for identification.)
8    BY MR. THOMPSON:
9         Q. Ms. Hoang, I am handing you a document
10   we have marked Exhibit 39. It is a series of
11   e-mails, and it starts at A1003 and goes through
12   A1306 and starts again at A1282 and A1259, the
13   last two back. I am not sure all these belong
14   together, but let's go through them.
15             I am going to start at the
16   very, very back at A1259. Do you have that?
17        A. Yes.
18        Q. A1259 is an e-mail from you to Steve
19   Montgomery dated June 17, 1999; is that correct?
20        A. Yes.
21        Q. It reads, I am sorry that I am not in
22   your group so neither are my macrolide ideas. Do
23   you see that?
24        A. Yes.
          ETTA R. JONES, C.S.R. - (773) 459-4111
```

389

```
1         Q. Do you recall sending this e-mail?
2         A. Yes.
3         Q. Do you recall why you sent it?
4         A. Yes.
5         Q. Why?
6         A. Because those were my ideas. Those were
7    not Steve Montgomery's ideas. Those were my
8    ideas.
9         Q. Do you recall why specifically you sent
10   that to him? Had he said something to you or
11   sent you something? Why did you send that?
12        A. I sent it because he was the head of the
13   Clari Group and he wanted to take my macrolide
14   ideas from me.
15        Q. Turn back to A1282. I believe this is a
16   duplicate of one we saw before. It is from you
17   to Elspeth Gray dated September 22, 1999. It
18   reads, I am sorry Steve Montgomery is not my
19   manager and I am still in charge of my work. Do
20   you see that?
21        A. Yes, correct.
22        Q. Then we get to A1306. Is that an e-mail
23   from you to Steve Montgomery dated March 27,
24   2001?
          ETTA R. JONES, C.S.R. - (773) 459-4111
```

390

```
1         A. Yes.
2         Q. A1305 an e-mail from you to Steve
3    Montgomery dated March 27, 2001?
4         A. Yes.
5         Q. Do you recall what this was about?
6         A. Yes. It is about he asked -- one time
7    in 1998 he asked me to put a protected group
8    under 11, 12-hydroxyls of bis-TMS Ery Moxime
9    Ketal by silylation.
10        Q. So why are you writing him this e-mail
11   in March of '01?
12        A. Because he referred to mentorship. He
13   asked me what he mentored me. So I told him the
14   work that he gave me was the work that he
15   mentored me.
16        Q. As I look at these, it looks like they
17   actually start on the first page and go back in
18   terms of the order of the e-mails this time. So
19   on page A1300, the first page, there is an e-mail
20   from you to Steve Montgomery dated March 22nd.
21        A. Yes.
22        Q. On A1301 there is an e-mail from Steve
23   Montgomery back to you on March 23rd, correct?
24        A. Correct.
          ETTA R. JONES, C.S.R. - (773) 459-4111
```

399

1   December of 2001?
2       A.  Because I was too sick.  I could not do
3   anything.  I could not communicate.  I was too
4   sick, too scared of Abbott people.
5       Q.  Why do you believe that Steve Montgomery
6   was behind the events that happened to you in
7   2001 at Abbott Labs?
8       A.  Because Steve Montgomery was the head of
9   the Clari Group, and he told people not to
10  respond to my questions.  He told Ken Wilson not
11  to respond to my questions.  He told John Adamek
12  to ignore my questions.  He told Maurizio to tell
13  me that -- Maurizio not to answer my questions.
14  Maurizio told me that Steve Montgomery told him
15  not to answer.  So John Adamek told me that Steve
16  Montgomery told him not to answer.  Ken Wilson
17  told me that Steve Montgomery told him not to
18  answer to my questions.
19      Q.  What makes you think that Steve
20  Montgomery had anything to do with you being
21  fired from Abbott Labs?
22      A.  Because I said no to him, I didn't want
23  him to touch me, I didn't want him to follow me
24  everywhere, and I was very scared.  He continued

ETTA R. JONES, C.S.R. - (773) 459-4111

400

1   to send the note when I went on medical leave of
2   absence.  He wanted me to come back so he could
3   continue to touch me.  So I didn't come back, and
4   so he fire.  After he fire me, he continued to
5   send the Japanese dictionary, some coffee cups
6   and a map of Vietnam, which I already returned to
7   him, and that make me very upset.
8       Q.  When did you receive those items that
9   you just described?
10      A.  I received those items in March, April
11  of 2002 after I got fired.
12      Q.  Did anyone at Abbott Labs ever tell you
13  what happened to the Clari projects you were
14  making inquiries about?
15      A.  Nobody.  I did not get any response from
16  anybody, and Steve did not even respond to my
17  questions either.
18      Q.  Does that continue all the way through
19  until you were fired?
20      A.  Yes.
21      Q.  You attended the deposition of Steve
22  Montgomery.  Do you recall Steve Montgomery's
23  testimony regarding being in your cubicle after
24  you had been separated from employment with

ETTA R. JONES, C.S.R. - (773) 459-4111

401

1   Abbott Labs?
2       A.  Yes.
3                   He come into my cubicle, and
4   he -- Maurizio testified that there was some
5   papers from other people, but that was not true
6   because the person before I came to that cubicle,
7   new place, the person already cleaned out the
8   desk well.  When I move in there was all my
9   stuff.  All my Clari ideas were there.  I did not
10  keep any of the Clari documents after they kicked
11  me out of the Clari Group in 1999.  I already
12  return all the documents -- Clari documents back
13  to the Clari Group, and there was nothing else
14  there.
15                  Why did Steve Montgomery come
16  to my lab?  Why did he come to my cubicle?  What
17  was he doing there?
18      Q.  When you received the Scientist of the
19  Year award in -- when was that?
20      A.  It was April of 1998 for the work I did
21  in 1997.
22      Q.  What did you understand that it meant to
23  receive the Scientist of the Year award from
24  Abbott Laboratories?

ETTA R. JONES, C.S.R. - (773) 459-4111

402

1       A.  It would help the promotion.  It would
2   help with advancing in my career.  Just like
3   Steve Montgomery testified that he want to be in
4   the Voliver Society (phonetic).  In order to be
5   in the Voliver Society, you have to be at least
6   grade level 22.  As a Section Manager, Steve
7   Montgomery grade level is only 21.  So winning
8   the Scientist of the Year award also help the
9   promotion, help advance in your career.
10      Q.  When you won Scientist of the Year, how
11  many other scientists were there working in North
12  Chicago for Abbott Laboratories?
13              MR. THOMPSON:  Objection, foundation.
14              MR. ANDREWS:  You can answer, if you
15  know.
16              THE WITNESS:  There was seven thousand
17  scientists.
18  BY MR. ANDREWS:
19      Q.  How do you know that?
20      A.  Because it is on the Abbott web site.
21      Q.  How many scientists received the
22  Scientist of the Year award the year that you
23  received it?
24      A.  There were only four category.  Three

ETTA R. JONES, C.S.R. - (773) 459-4111

403

1   for -- one for discovery, one for product
2   development, one for new product and there was
3   one Associate Scientist of the Year award.  So
4   there were four awards given per year.
5       Q.  Did something happen in the spring of
6   2001 that upset you regarding awards of Scientist
7   of the Year or President's Award being awarded to
8   anyone?
9           MR. THOMPSON:  Objection, leading.
10          THE WITNESS:  Yes.
11              The Scientist of the Year award
12  was given to Maurizio based on my inventions, and
13  I was very upset because that was my discovery.
14  The President's Award was given to the Clari
15  Group based on my inventions, too.  Other people
16  were getting credit for my inventions.
17  BY MR. ANDREWS:
18      Q.  Did you understand that the ideas that
19  you worked on while in the Clari Group belonged
20  to Abbott Laboratories?
21      A.  Yes, I did.
22      Q.  Then why do you care who gets the
23  credit?
24      A.  Because the credit will help me advance

ETTA R. JONES, C.S.R. - (773) 459-4111

404

1   in my career at Abbott, and the inventorship is
2   very important because at Abbott only a true
3   inventor can file a patent.  So inventorship and
4   ideas is very important.
5       Q.  On Exhibit 37 that you were shown
6   today -- would you take a look at that.  At the
7   bottom of the page it says, I am sorry that Steve
8   Montgomery is not my manager and I am still in
9   charge of my work, Diep Hoang.  What do you mean
10  by that, that you were sorry that Steve
11  Montgomery is not your manager?
12      A.  I didn't want him to get upset because I
13  was still in charge of my work and he tried to
14  take my work away from me.
15      Q.  Who were you telling this to?
16      A.  To the people in U.K. because Steve
17  Montgomery told these people to send e-mails to
18  take my inventions away from me.
19      Q.  Would you take a look at Exhibit 35.
20  Exhibit 35 is dated 04/16/99; is that right?
21      A.  Yes.
22      Q.  Is 04/16/99 the same time frame as the
23  Easter weekend when Steve Montgomery asked you to
24  come to the laboratory?

ETTA R. JONES, C.S.R. - (773) 459-4111

405

1       A.  Yes.
2       Q.  You started to testify that Steve
3   Montgomery was mad.  How did he express that to
4   you?
5       A.  He wrote my performance evaluation, and
6   part of the performance evaluation that he wrote
7   were not true.  For example, it was Raphael Lopez
8   who did not finish -- did not give enough time to
9   finish the presentation.  It was Raphael Lopez,
10  not me, and I wrote that on my performance
11  evaluation.  It was Maurizio Acquasaliente who
12  created the conflict, not me.  I did not create
13  the conflict.  The Clari people were not
14  responding to me.  They were withholding
15  information.  So they were the ones who needed to
16  communicate better.
17              He wrote on my performance
18  evaluation that I was not allowed to work on my
19  ideas, inventions.
20      Q.  Did he indicate in any other manner to
21  you that he was angry with you other than how you
22  have described in this performance evaluation?
23      A.  He told people not to respond to me
24  continuously until I was fired.

ETTA R. JONES, C.S.R. - (773) 459-4111

406

1       Q.  You testified earlier today about a
2   conversation with Cindy Perez.  Can you tell me
3   where the conversation took place?
4       A.  It was in her office.
5       Q.  Who was present?
6       A.  Cindy Perez, Laura Song and myself.
7       Q.  Who called the meeting?
8       A.  Laura Song and Cindy Perez.
9       Q.  Who spoke first at the meeting?
10      A.  Cindy Perez.
11      Q.  What did Cindy Perez say?
12      A.  She was aware of what I told Laura Song,
13  and she told me that she told Steve Montgomery
14  not to send me anymore e-mails and she told me
15  not to send Steve Montgomery anymore e-mails.
16      Q.  What else was said at this meeting?
17      A.  I told her that I was sexually harassed
18  by Steve Montgomery, and I told her that he wrote
19  to me many love letters and he even sent me
20  threatening notes in the spring of 2001.
21      Q.  Did anyone say anything back to you
22  about that?
23      A.  No.
24      Q.  What was said then?

ETTA R. JONES, C.S.R. - (773) 459-4111

```
                                                    419
1              Why was I on the watch list?  I
2   don't know.  No one told me about that.
3       Q.  How did you learn you were on the watch
4   list?
5       A.  I don't know.  I don't know.  My manager
6   didn't tell me.  John Adamek didn't tell me, so I
7   didn't know.
8       Q.  How did it come up to you?
9       A.  Maybe Dave Hill told me that I was on --
10  no, not Dave Hill.  Ramesh Patel told me I was on
11  the watch list.  None of the managers told me I
12  was on the watch list.  Mel Hodkinson even told
13  me that there was no such watch list when I met
14  with him one day.
15      MR. ANDREWS:  Let's mark the next
16  exhibit as 47.
17              (WHEREUPON, Hoang Deposition
18               Exhibit Number 47 was marked
19               for identification.)
20  BY MR. ANDREWS:
21      Q.  I am showing you Exhibit 47.  In the
22  middle of the page here, is this an e-mail from
23  you to Steve Montgomery?
24      A.  Yes.
        ETTA R. JONES, C.S.R. - (773) 459-4111
```

```
                                                    420
1       Q.  Why did you send this e-mail?
2       A.  This was during the week of Easter and
3   he continued to come to my lab and he
4   continued -- he wanted to have oral sex or
5   something.  So I told him to stop.  I told him
6   that I didn't want that to happen anymore.
7       Q.  When you met with Laura Song, why didn't
8   you tell Laura Song that you -- that Steve
9   Montgomery had asked you to have oral sex with
10  him?
11      A.  Because I was embarrassed.  It is in my
12  culture not to talk about it, and I was scared to
13  report that.  I didn't want to get in trouble.
14      Q.  Did Steve Montgomery ever send you a
15  book about witches and sorcerers in Vietnam?
16      A.  Yes, he did.  That was a Christmas
17  present that he gave me.
18      Q.  What did you think of that present?
19      A.  I was very disturbed because it was
20  Christmas and I am Christian.  It was so
21  disturbing to me that I threw that book away.  He
22  is also Christian, too.
23      Q.  You testified, I believe earlier, that
24  Mel Hodkinson said that at one time in 1999 that
        ETTA R. JONES, C.S.R. - (773) 459-4111
```

```
                                                    421
1   Steve Montgomery told him to tell you that you
2   were already dead.
3       A.  Yes.  I met with Mel Hodkinson
4   February 27, and Mel Hodkinson told me that Steve
5   Montgomery told him that I was already dead, no
6   longer alive.
7       Q.  When was that?
8       A.  February 27, 1999.
9       Q.  This was when you were coming back from
10  your first medical leave of absence?
11      A.  Yes.  I came back on the 1st of February
12  1999.  On the 2nd I met with Mel Hodkinson to
13  find out why I got moved out of the Clari Group.
14  At that time I was so devastated and shocked.
15      Q.  What did you receive, if anything, from
16  Abbott Laboratories for being awarded Scientist
17  of the Year?
18      A.  I received 50 shares of Abbott stock.
19      Q.  Anything else?
20      A.  And a trophy.
21      Q.  Do you recall having a meeting with
22  Maurizio Acquasanliente and Katherine Green in
23  the fall of 2001?
24      A.  Yes.  And Kenny Wilson also present.
        ETTA R. JONES, C.S.R. - (773) 459-4111
```

```
                                                    422
1       Q.  All three were present in the same
2   meeting with you?
3       A.  Yes.
4       Q.  Was the door closed in that meeting?
5       A.  Yes, it was closed.
6       Q.  Where were people seated in the room
7   during that meeting?
8       A.  I was sitting -- my back was against the
9   wall and Ken Wilson was sitting right near the
10  door and Maurizio was sitting on the left side of
11  Maurizio and Katherine Green was sitting on the
12  right -- I am sorry -- Katherine Green was
13  sitting on the left side of Ken Wilson and
14  Maurizio Acquasaliente was sitting on the right
15  side of Ken Wilson.
16      Q.  Who called that meeting?
17      A.  Kathy Green.
18      Q.  What happened at that meeting?
19      A.  She called me to the office and she told
20  me that there were three things that she wanted
21  me to do.  The first one was to call Maurizio
22  when I was out sick, the second one was to attend
23  department meeting and to attend one-on-one
24  meeting with Maurizio Acquasaliente, and number
        ETTA R. JONES, C.S.R. - (773) 459-4111
```

**423**

1  three was to give up all my inventions without
2  letting me work on my inventions.
3     Q. What else was said at that meeting?
4     A. I told her I was very sick. I could not
5  work with -- I could not face the Clari people.
6  That's why I could not attend the department
7  meeting and I had posttrauma stress disorder,
8  that I could not face the Clari people. I was
9  harassed by Maurizio Acquasaliente. I said that
10  he won the Scientist of the Year award for my
11  inventions and he harass me before he took my
12  equipment and he broke my glasswares, he took my
13  ideas away from me, he created conflict.
14     Q. What else was said at the meeting?
15        MR. THOMPSON: Counsel, just for the
16  record, I object to all this testimony to the
17  degree it is inconsistent with the testimony that
18  Mr. Maurizio gave regarding the meeting.
19        THE WITNESS: I just remember more.
20        MR. ANDREWS: Tell us everything you
21  remember about the meeting.
22        THE WITNESS: In addition, I asked
23  Katherine Green if there was a grievance form
24  that I could fill out. She said there was no

ETTA R. JONES, C.S.R. - (773) 459-4111

**424**

1  such form. I also asked why I couldn't work on
2  my ideas. She did not give me an explanation.
3  She said I could not work on my ideas. I had to
4  give up 32 projects, ideas to the Clari Group for
5  them to work on, for other people to work on.
6  BY MR. ANDREWS:
7     Q. Was anything else said at the meeting?
8     A. I told her I would get back to my doctor
9  and talk to my doctor first if I have to attend
10  any department meeting with the Clari people.
11     Q. How long did this meeting last?
12     A. From 8:30 until noon time. She told me
13  to sit -- as I was getting up to leave the room,
14  Katherine Green told me not to. She said I could
15  not leave until I agree to give up all 32 project
16  ideas. I did not agree, so I had to sit there
17  until noon time.
18     Q. How did you the meeting end?
19     A. She let me go.
20     Q. At noon?
21     A. Yes.
22     Q. After that meeting what did you do?
23     A. I was so sick and I was so upset that I
24  went home. I could not work on it that day

ETTA R. JONES, C.S.R. - (773) 459-4111

**425**

1  anymore.
2     Q. Did you ever return to Abbott
3  Laboratories after that day?
4     A. Yes, the second day I went back to work.
5     Q. Did you have another meeting in the fall
6  of 2001 with any of those people who were at that
7  first meeting?
8     A. I had a meeting again with Katherine
9  Green and Ken Wilson, second meeting and third
10  meeting, and again the same thing. They repeated
11  the same thing, but this time I did call Maurizio
12  Acquasaliente when I was out sick. But then I
13  still could not attend the department meeting
14  with the Clari people and I did not agree to give
15  up my inventions. So she offer me a job to work
16  in fermentation.
17     Q. Was this at the third meeting?
18     A. It was the third meeting, yes. She
19  offered a job to work in Fermentation. At that
20  time I could not make a decision because I was
21  too sick and too scared because I did not know
22  what would happen to me.
23        At the same time I did not
24  agree to give up my 32 project ideas. So when --

ETTA R. JONES, C.S.R. - (773) 459-4111

**426**

1  later on Steve said that Fermentation Group also
2  reported back to him.
3     Q. Just about the third meeting, anything
4  else said at the third meeting?
5     A. That was it. They pressured me to
6  accept the new position, but the new position had
7  no grade level written on the description.
8     Q. How long did the third meeting last?
9     A. It last almost half a day.
10        MR. THOMPSON: I have the same
11  objection to the degree this testimony is
12  inconsistent with other testimony. It seems to
13  get longer every time we hear about it.
14        THE WITNESS: It was shorter than the
15  first meeting. It was shorter.
16  BY MR. ANDREWS:
17     Q. How long was it?
18     A. Maybe two, three hours.
19     Q. After that meeting then what did you do?
20     A. I was so upset that I could not work. I
21  went home. I was so sick I went home. I
22  couldn't work.
23     Q. Did you ever return to Abbott
24  Laboratories after that?

ETTA R. JONES, C.S.R. - (773) 459-4111

# Exhibit H

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED

AUG 2 2 2003

JUDGE PAUL PLUNKETT

| | | |
|---|---|---|
| Plaintiff(s) | ) | Case Number: 03 C 2910 |
| DIEP X. HOANG | ) | |
| | ) | Judge: Plunkett |
| v. | ) | |
| | ) | Magistrate Judge: Schenkier |
| Defendant(s) | ) | |
| ABBOTT LABORATORIES | ) | |
| | ) | |

**NOTICE OF MOTION**

DOCKETED

AUG 2 8 2003

TO:   Hubert Thompson
      Ronald Austin, Jr.
      **BROTHERS & THOMPSON, P.C.**
      20 East Jackson, Suite 650
      Chicago, Illinois 60604
      (312) 372-2909

PLEASE TAKE NOTICE THAT on **Wednesday, August  27, 2003 at  10:30
a.m.,** I shall appear before Honorable Judge Paul E. Plunkett, or any judge sitting in his
stead, in courtroom 1441 and present Diep X. Hoang's MOTION TO PROTECT DIEP
HOANG'S DISCOVERIES AND INVENTIONS.

**CERTIFICATE OF SERVICE**

The undersigned certifies that she caused a copy of the foregoing to be served on
the individual listed above via U. S. Mail, postage prepaid, on this 22nd day of August,
2003.

_____
Diep X. Hoang

Diep X. Hoang
2454 W. Gunnison Street
Chicago, Illinois 60625
(773) 878 – 1208

20

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

*FILED*

*AUG 2 2 2003*

*JUDGE PAUL PLUNKETT*

| | | |
|---|---|---|
| Plaintiff(s) | ) | Case Number: 03 C 2910 |
| DIEP X. HOANG | ) | |
| | ) | Judge: Plunkett |
| v. | ) | |
| | ) | Magistrate Judge: Schenkier |
| Defendant(s) | ) | |
| ABBOTT LABORATORIES | ) | |
| | ) | |

*DOCKETED*

*AUG 2 8 2003*

## MOTION TO PROTECT DIEP HOANG'S DISCOVERIES AND INVENTIONS

Now comes Diep Hoang, the plaintiff, hereby moves this Honorable Court for protection
of Diep Hoang's discoveries and inventions in any form and at any time from the past to
the present and to the future.

In support thereof, it state as follows:

1. Diep Hoang has many ideas through her discoveries and inventions.

2. Diep Hoang is a non-Ph. D. Scientist.

3. The scientist attains renown and credibility through publication of her research.

4. Disclosure of unpublished research prematurely would amount to an unfair intrusion
into the scientific process by effectively robbing the scientist of the opportunity to reveal
the results of that research in her own time.

5. Moreover, without this choice of being publishing her research work as she chooses,
the scientist loses a major incentive for producing quality scientific work, and the
scientist's career could be placed at risk and damaged due to an in ability to publish her
own research.

Premature disclosure of unpublished scientist research singles out the scientist and
exposes her to unfair and significant intrusion into the scientific process.

Therefore, the plaintive asks that the court to consider the plaintiff's privilege and any
attempt to acquire her research ideas, data and results could be blocked under intellectual
property theories of unfair competition and trade secret protection.



Wherefore, Diep Hoang, prays that this Court enter an Order granting her the protection
of her discoveries and inventions, and that such protection be granted.

Respectfully submitted,

_Diep Hoang_ Aug 22, 2003
Diep Hoang, Plaintiff Pro Se

# Exhibit I

*ul*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DIEP X. HOANG, | ) | 03cv2910 |
| | ) | |
| Plaintiff, | ) | No. 03 C 2910 |
| | ) | |
| v. | ) | Judge Ronald A. Guzmán |
| | ) | |
| ABBOTT LABORATORIES, | ) | |
| KATHERINE GREEN, KENNETH | ) | |
| A. WILSON and MAURIZO | ) | |
| ACQUASALIENTE, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff has sued Abbott Laboratories, Katherine Green, Kenneth A. Wilson and Maurizo Acquasaliente for their alleged violation of her rights under Title VII, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and state tort law. Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56 on Counts I-IV, VI and VII of the fourth amended complaint and to strike various of plaintiff's submissions.[1] For the reasons set forth below, the Court grants the summary judgment motion and strikes as moot defendants' motions to strike.

### Facts[2]

In April 1993, Abbott hired Hoang as a technician in its microbiology laboratory. (Defs.' LR 56.1(a)(3) Stmt. ¶ 1.) In April 1994, Hoang applied for and received a position as a laboratory

---

[1]The Court dismissed Counts V and VIII in March 2005. (*See* 3/17/05 Min. Order.)

[2]Unless noted otherwise, the following facts are undisputed.

technician on Abbott's Clarithromycin project ("the Clari Group"). (*Id.*) While she was in the Clari Group, Abbott promoted Hoang to the position of associate scientist, a position she held until Abbott terminated her in January 2002. (*Id.* ¶¶ 1, 30.)

While she was in the Clari Group, plaintiff's direct supervisor was group leader John Adamek. (*Id.* ¶ 2.) Adamek reported to Stephen Montgomery. (*Id.*) By the end of 1994, however, Montgomery had transferred to the Ritonavir/Lopinavir Group. (*Id.*)

In January 1997, Hoang and Montgomery began exchanging personal notes and emails. (*Id.* ¶ 3.)

In April 1998, Abbott gave Hoang its Scientist of the Year Award for work she did in the Clari Group during 1997. (Pl.'s LR 56.1(b) Stmt., Ex. F, Hoang Dep. at 401.) Montgomery nominated her for the award. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 12.)

In September 1998, Hoang and Montgomery spent several hours in a hotel room at O'Hare airport engaging in sexual activity. (Pl.'s LR 56.1(b) Stmt., Ex. A, Montgomery Dep. at 29-31; *id.*, Ex. F, Hoang Dep. at 345-49.) Plaintiff says her participation was coerced, an assertion Montgomery disputes. (*Id.*, Ex. F, Hoang Dep. at 347; *Id.*, Ex. A, Montgomery Dep. at 30-31.) The next day, plaintiff began a medical leave of absence for anxiety. (*Id.*, Ex. A, Montgomery Dep. at 28-29; *id.*, Ex. F, Hoang Dep., Hoang Dep. Ex. 20, 10/21/98 Disability Form.)

In January 1999, while Hoang was on medical leave, Montgomery left the Ritonavir/Lopinavir Group and became the section manager of the Clari Group. (*Id.*, Ex. A, Montgomery Dep. at 27-29.)

Hoang returned to work on February 2, 1999. (*Id.* at 29.) That afternoon, Montgomery kissed and fondled Hoang in her laboratory. (*Id.*, Ex. F, Hoang Dep. at 358-59.) The next day, she learned that she had been reassigned from the Clari Group to the Ritonavir/Lopinavir Group. (*Id.*,

Ex. A, Montgomery Dep. at 29.) Montgomery says he does not know why she was transferred. (*Id.* at 27.)

Several days later, Hoang followed Montgomery to an empty office where he kissed and fondled her again. (*Id.*, Ex. F, Hoang Dep. at 360-61.) At some point in the same month, Montgomery asked Hoang to sleep with him, but she refused. (*Id.* at 362.)

At the end of February 1999, Montgomery wrote the self-evaluation portion of Hoang's performance review for 1998. (*Id.*, Ex. A, Montgomery Dep. at 52-53.)

It is not clear whether Montgomery had any other physical contact with Hoang between March and June 1999. At some point during the summer of 1999, however, Montgomery took Hoang into a closet where she performed oral sex on him. (*Id.*, Ex. F, Hoang Dep. at 364-65.) She did so, she says, because she was "scared of him." (*Id.* at 365.)

In August 1999, Montgomery visited Hoang's cubicle and kissed her. (*Id.* at 361-63.) Apparently, the two had no physical contact for the next year. (*Id.* at 362-63.)

The last time Montgomery touched Hoang in any way was in the summer of 2000, when he touched her face. (*Id.* at 363-64.)

In March and April 2001, Hoang began sending multiple emails to Montgomery and other members of the Clari Group requesting information about the status of projects on which she had worked. (*See, e.g.*, Pl.'s LR 56.1(b), Ex. A, Montgomery Dep. Ex. 3, Email from Hoang to Adamek of 4/6/01; *id.*, Montgomery Dep. Ex. 4, Email from Hoang to Hodkinson of 4/6/01.) On at least two occasions in the spring of 2001, Montgomery told members of the Clari Group to ignore Hoang's emails. (*See id.*)

In May 2001, Hoang complained to Human Resources Manager Laura Kroc that Montgomery had sexually harassed her by touching her hand, arm and face and following her to the cafeteria and

train station. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 6.) Because Kroc was moving to a new job, she told

Human Resources Director Cynthia Perez about Hoang's complaint. (*Id.*)

In June 2001, Perez met with Montgomery, who denied that he had harassed Hoang. (*Id.* ¶

7.) Afterward, Perez reported Montgomery's response to Hoang and asked her if she had anything

else to add. (*Id.* ¶ 8.) Hoang said that Montgomery had recently visited her cubicle at her request

but said nothing about the other physical contact the two had allegedly had. (*Id.*)

During this meeting, Perez also asked Hoang about the emails she had been sending to

Montgomery, Adamek and Mel Hodkinson concerning the fate of the work she had done with the

Clari Group. (*Id.* ¶ 9.) Perez told Hoang to direct any future questions about that work to her

manager, defendant Kenneth Wilson, because some of the email recipients had complained about the

emails Hoang was sending. (*Id.*)

In August 2001, Acquasaliente suggested, in response to Hoang's email inquiries about the

Clari work, that he, Hoang and Montgomery meet to discuss her ideas. (*Id.*, Ex. A, Montgomery

Dep, Montgomery Dep. Ex. 17, Email from Acquasaliente to Montgomery of 8/28/01.) That

meeting, however, was never held. (*Id.*, Ex. A, Montgomery Dep. at 102.)

On October 1, 2001, defendant Acquasaliente, who had previously worked with Hoang in the

Clari Group, became Hoang's group leader in the Ritonavir/Lopinavir Group. (Pl.'s LR

56.1(b)(3)(B) Stmt. ¶¶ 10-11.) Hoang felt that Acquasaliente had stolen her ideas and taken credit

for her work when they worked in the Clari Group. (*Id.* ¶ 11.) When Acquasaliente asked Hoang

to attend one-on-one meetings with him, as he held with the other members of the group, she refused.

(*Id.* ¶ 10.) Acquasaliente discussed Hoang's refusal with defendant Human Resources Manager

Katherine Green. (*Id.* ¶ 11.)

4

In November 2001, Hoang had two meetings with Green and Wilson, who was Acquasaliente's supervisor, and a third meeting with Green, Wilson and Acquasaliente. (*Id.* ¶ 12.) In the first meeting, the one that Acquasaliente attended, Hoang was told that she had to report to Acquasaliente and notify him if she called in sick, and "would have to give up her ideas and projects." (*Id.* ¶ 13.)

In the second meeting, Hoang told Wilson and Green that she would not meet with Acquasaliente because "she could not face those Clari people." (*Id.* ¶ 15 (quotation omitted).) Green and Wilson told Hoang that she had to attend meetings with Acquasaliente and "could not work on her ideas." (*Id.* (quotation omitted).) Green also told Hoang that she could be reassigned to the Fermentation Group if she did not want to work with Acquasaliente. (*Id.* ¶ 16.)

The last meeting occurred on November 20, 2001. (*Id.* ¶ 17.) During that meeting, Hoang said Green tried to force her to accept a position in the Fermentation Group. (*Id.*) Hoang, who said she "felt intimated by [Green's] actions" and "was afraid to go to work again," did not return to work after that date. (*Id.*; *id.*, Ex. F, Hoang Dep. at 123-24.)

On November 21, 2001, Wilson sent a letter to Hoang, that said:

> Your unwillingness to talk with or attend any of the meetings requested by [Acquasaliente] is considered a serious disregard for the direction of your manager. On October 26, 2001, Kathy Green from human resources met with you to discuss this matter. At that meeting you indicated that you were "uncomfortable" with the very idea of having to attend meetings with anyone – including [Acquasaliente] – who might have previously worked in the clari group. . . .

> [Y]ou have to date not responded to any of [Acquasaliente's] meeting requests. Because we are not willing to let this conduct to persist, we are giving you the option of being reassigned to another area – doing the same or similar duties to those you currently perform. . . .

> We are voluntarily offering you this alternative job assignment to give you the opportunity to perform in an environment that you might find more "comfortable."

5

However, as discussed in our meeting yesterday, you need to make a decision to accept or decline this alternative job assignment by next week Monday, November 26, 2001. If you accept this alternative job assignment, you will attend a weekly one-on-one meeting with me during the two to three weeks preceding your move. If you choose to remain in your current position, you will be required to regularly attend one-on-one meetings and section meetings with [Acquasaliente]. Failure to comply with the sort of meeting requests described above would be viewed as insubordination and could lead to serious corrective action up to and including termination.

(Def.'s LR 56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 11, Letter from Wilson to Hoang of 11/21/01.)

Hoang acknowledged receiving the letter but did not respond to it. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 18-19.)

On November 28, 2001, Abbott sent Hoang information about applying for short-term sick pay. (*Id.*, Ex. 9, Hoang Dep. Ex. 25, Letter from Williams to Hoang of 11/28/01.)

On November 29, 2001, Wilson wrote a second letter to Hoang, saying:

[Y]ou have not yet accepted or declined the voluntary offer for an alternative job assignment . . . . Because attempts to get in touch with you by phone have not been successful[,] I am for a second time writing to solicit a response from you.

. . .

**It is important that you contact me immediately to inform me of your decision. Although I would prefer to speak with you directly, you can leave me a phone message or send me an e-mail with your reply.**

Along with the need to resolve the above-mentioned matter, your attendance record and repeated e-mail inquiries about the clari and lopinavir/rotinavir work groups are both issues that must be addressed. . . .

Our records show that you have accumulated over 100 hours of hourly sick time within the months of October and November combined. Prior to that time you had, between the months of June and September[,] accumulated thirty-six hours of hourly sick time. This pattern and number of intermittent absences is excessive.

I am aware that you have been offered the opportunity to request Family Medical Leave of Absence (FMLA) for several of your more recent absences. In addition it is my understanding that your current absence will be subject to review under

6

Abbott's "weekly sick" guidelines for temporary disability benefits. However, if it is determined that a majority of your absences, particularly during the months of October and November, are not FMLA based and/or not supported by objective medical reasons, you may be subject to corrective action for poor attendance.

. . .

I explained to you on numerous occasions that you are not to communicate via e-mail or otherwise with individuals both inside and outside of Technical Operations regarding the clari group. I am disappointed that you continually ignore my direction regarding this matter. . . . Work priorities in the clari group are not your concern. If you choose to remain in the lopinavir/rotinavir group you will have to communicate with the group leader concerning the work priorities for that group. If you choose to take the alternative work assignment, as previously discussed, you will not have a need to send e-mails or communicate with anyone regarding the lopinavir/rotinavir group. . . .

(*Id.*, Ex. 8, Hoang Dep. Ex. 12, Letter from Wilson to Hoang of 11/29/01.)

On November 30, 2001, Abbott sent Hoang a letter with instructions for applying for family medical leave. (*Id.*, Ex. 9, Hoang Dep. Ex. 27, Letter from Brock to Hoang of 11/30/01.) The letter said she had to submit a completed medical certification form to Abbott "within 15 days from the date of this letter" or the absence could "be considered in future attendance counseling." (*Id.*)

On December 10, 2001, Abbott suspended Hoang's sick pay benefits because she had not submitted "acceptable medical certification [for her] request for sick pay" under the short-term sick pay program. (*Id.*, Hoang Dep. Ex. 28, Letter from Brock to Hoang of 12/10/01.) The letter also said she might be eligible for family medical leave if she submitted appropriate medical information "within 15 calendar days of [her] receipt of this letter." (*Id.*)

On December 18, 2001, Abbott notified Hoang that her request for short-term sick pay benefits had been denied as of November 26, 2001 because Abbott had "been unable to obtain acceptable medical certification to support [her] request." (*Id.*, Hoang Dep. Ex. 29, Letter from Brock to Hoang of 12/18/01.) The letter also said she might be eligible for family medical leave if

7

she submitted appropriate medical information "within 15 calendar days of [her] receipt of this letter." (*Id.*)

On December 19, 2001, Human Resources Director Perez received an envelope from Hoang containing notes dated November 12, and December 10, 2001 from Dr. Joseph Mason. (*Id.*, Ex. 8, Hoang Dep. Ex. 15, Note from Mason to Human Resource Abbott Labs of 11/12/01; *id.*, Hoang Dep. Ex. 16, Note from Mason to Human Resource of 12/10/01; Pl.'s LR 56.1(b) Stmt., Ex. J, Perez Dep. at 129.) The November note said: "Ms. Diep is under my care for emotional distress related to complaints of harassment at work. It is my medical opinion she should not return to work with Clarithromycin Group." (Def.'s LR 56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 15, Note from Mason to Human Resource Abbott Labs of 11/12/01.) The December note said: "Hoang is currently under my care and is unable to work for the next 30 days due to medical illness." (*Id.*, Hoang Dep. Ex. 16, Note from Mason to Human Resource of 12/10/01.)

On December 26, 2001, Montgomery, who had just returned to work from his own medical leave, sent a letter to Hoang saying:

> The purpose of this note is to let you know that people at Abbott missed you and are praying for your speedy recovery. If I was able to make it back, I am sure you would be able to also. I hope that you recover and are able to return soon. I hope you have a happy new year.

(Pl.'s LR 56.1(b)(3)(B) Stmt ¶ 27.)

On December 27, 2001, Abbott notified Hoang that she was not eligible for family medical leave because "[w]e did not receive a timely medical certification (within 15 days)." (Def.'s LR 56.1(a) Stmt., Ex. 9, Hoang Dep. Ex. 32, Letter from Abbott to Hoang of 12/27/01.)

On January 8, 2002, Lois Ford, Divisional Vice President of Human Resources, sent a letter to Hoang that said:

8

It has come to our attention that you are personally in possession of laboratory notebooks containing important proprietary information belonging to Abbott. This is a serious violation of your Employee Agreement. You must contact your management immediately to arrange for the prompt return of these notebooks.

If you do not contact your management by January 10, 2002, we will assume that you are not willing to voluntarily produce these documents. We will then be forced to take serious action with respect to your employment, as well as action to ensure the return of our property.

(*Id.*, Hoang Dep. Ex. 33, Letter from Ford to Hoang of 1/8/02.)

On January 16, 2002, Ford wrote another letter to Hoang, terminating her employment "due to [her] extensive absences from work and the fact that [she was] not on authorized leave of absence." (*Id.*, Ex. 8, Hoang Dep. Ex. 14, Letter from Ford to Hoang of 1/16/02.) The letter also said that Hoang's failure to return the laboratory notebooks at Abbott's request "further reinforced our decision to terminate your employment." (*Id.*) Montgomery had no involvement in the decision to terminate plaintiff. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 35.)[3]

Sometime after January 16, 2002, Abbott received another note from Dr. Mason dated January 10, 2002. (*Id.* ¶ 33.) The note said: "Diep Hoang is a patient under my care. She is unable to return to work for the next 30 days, due to severe medical illness." (Def.'s LR 56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 17, Note from Mason to Human Resources of 1/10/02.)

On November 12, 2002, Hoang filed a charge with the EEOC alleging race, sex, national origin and disability discrimination. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 36.) The EEOC issued her a right to sue letter on January 31, 2003. (*Id.*)

On April 20, 2003, plaintiff filed this suit. (*Id.* ¶ 37.)

---

[3]Plaintiff denies that Montgomery was not involved, but the evidence she cites in support of that denial does not controvert that fact.

## <u>Discussion</u>

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

## **<u>Federal Claims</u>**

In the first count of her fourth amended complaint, Hoang alleges that she was subjected to sexual harassment by Montgomery in violation of Title VII from 1996 through her termination in January 2002. (Compl., Count I ¶ 17.) Abbott says this claim is time-barred because Montgomery's alleged harassment stopped long before plaintiff's termination and more than 300 days before plaintiff filed suit.

The Court agrees. Plaintiff admits that the last physical contact between she and Montgomery occurred in the summer of 2000 (Pl.'s LR 56.1(b) Stmt., Ex. F, Hoang Dep. at 364), and there is no evidence that they had any contact at all after Montgomery's get-well letter to her dated December 26, 2001. (*See id.* ¶ 27.) The record shows that Montgomery never directly supervised Hoang, and does not suggest that he had input of any kind into any of her performance reviews after 1998. (*See id.* ¶¶ 1-2; *id.*, Ex. A, Montgomery Dep. at 52-53.) Finally, there is no evidence that suggests

10

Montgomery made or contributed to the decision to terminate Hoang, which Abbott says was made by Ford. (*Id.* ¶ 35.)[4] Thus, viewed favorably to her, the record shows that Montgomery's alleged harassment ended, at the latest, on December 26, 2001.

"Under Title VII, a plaintiff has 300 days from the occurrence of an allegedly discriminatory act in which to file a timely charge either with the federal Equal Employment Opportunity Commission or the appropriate state agency . . . ." *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999). Plaintiff filed her EEOC charge on November 12, 2002 (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 36), more than 300 days after Montgomery's last alleged act of harassment. Accordingly, her harassment claim is untimely.

In Count II, plaintiff alleges that Abbott terminated her because of her gender in violation of Title VII. To defeat Abbott's motion on this claim, plaintiff must offer direct or circumstantial evidence that suggests the termination decision was motivated by her gender, or comply with the burden-shifting method of proof articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Pafford v. Herman*, 148 F.3d 658, 665 (7th Cir. 1998). Plaintiff attempts to do the former.

Plaintiff says Abbott's discriminatory animus can be inferred from a variety of Montgomery's actions and omissions, including his: (1) telling Clari Group members in the spring of 2001 to ignore Hoang's emails; (2) refusal to meet with Acquasaliente and Hoang in the fall of 2001 to discuss the Clari project; (3) failure in the spring of 2001 to defend Hoang from others' accusations that she was paranoid; (4) his inability to explain why Hoang was transferred out of the Clari Group when she returned from medical leave in February 1999; (5) his failure to admit to his supervisor, defendant

---

[4]*See* n.3.

11

Wilson, or employees of Abbott's human resources department that he had had sexual contact with

Hoang; and (6) retrieval of data pertaining to Clari Group work from Hoang's cubicle after she was

fired.

Even if all of those facts were supported by the record, and they are not, they still would not

save plaintiff's discrimination claim. As noted above, there is no evidence that Montgomery

contributed in any way to Abbott's decision to terminate plaintiff. (*See* Pl.'s LR 56.1(b) Stmt. ¶ 35.)[5]

Absent such evidence, even if these "facts" suggested that Montgomery harbored gender bias, they

would not support the inference that Ford terminated plaintiff because of her gender. Accordingly,

Abbott is entitled to judgment as matter of law on Count II.

In Count III, plaintiff alleges that Abbott violated the ADA by refusing to accommodate her

disability and firing her because of her disability. The ADA forbids employers to discriminate

against any "qualified individual with a disability." 42 U.S.C. § 12112(a). A "qualified individual

with a disability" is a "an individual with a disability who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such individual

holds or desires." 42 U.S.C. § 12111(8). The accommodations to which plaintiff says she was

entitled are (1) "a limited leave of absence"; (2) a "transfer[] away from people who had worked on

the Clari projects." (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 25.)

The record shows, however, that the leave of absence plaintiff sought was not "limited." It

is undisputed that plaintiff last worked on November 20, 2001, and the evidence she offers shows

that she would not have been able to return to work until sometime in February 2002. (Pl.'s LR

56.1(b)(3)(B) Stmt. ¶ 17; *id.*, Ex. F, Hoang Dep. at 124; *id.*, Ex. L, Mason Aff. ¶ 11; Defs.' LR

---

[5]*See* n.3.

56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 16, Note from Mason to Human Resource of 12/10/01.) In

other words, the accommodation plaintiff sought was not having to work for more than two months.

In *Byrne v. Avon Products, Inc.*, however, the Seventh Circuit squarely rejected the notion

that a "multi-month" leave of absence is a reasonable accommodation under the ADA:

> From November 1998 through mid-January 1999 Byrne . . . . was incapable of
> working. Byrne acknowledges this but contends that he should have been
> accommodated by being allowed *not* to work. That is not what the ADA says. The
> sort of accommodation contemplated by the Act is one that will allow the person to
> "perform the essential functions of the employment position." Not working is not a
> means to perform the job's essential functions. An inability to do the job's essential
> tasks means that one is not "qualified"; it does not mean that the employer must
> excuse the inability.
>
> Time off may be an apt accommodation for intermittent conditions. . . . But Byrne
> did not want a few days off or a part-time position; his only proposed accommodation
> is not working for an extended time, which as far as the ADA is concerned confesses
> that he was not a "qualified individual" . . . .

328 F.3d 379, 380-81 (7th Cir. 2003). Thus, *Byrne* dooms plaintiff's first accommodation.

Plaintiff fares no better with her second accommodation claim, that Abbott should have

transferred her away from the Clari Group people, because there is no dispute that Abbott offered

to do just that. (*See* Defs.' Mot. Strike Portions Pl.'s LR 56.1(b)(3)(C) Stmt. Add'l Facts, Ex. 2,

Montgomery Dep. at 153-55 (discussing, in context of his performance review for that year, that the

fermentation group had started reporting to him in 2002); Def.'s LR 56.1(a) Stmt., Ex. 8, Hoang Dep.

Ex. 11, Letter from Wilson to Hoang of 11/21/01 & Ex. 12, Letter from Wilson to Hoang of 11/29/01

(offering Hoang a transfer to the fermentation group in November 2001).) Plaintiff's failure to take

Abbott up on that offer does not subject it to ADA liability.

Abbott is also entitled to judgment on plaintiff's ADA discharge claim. As noted above,

plaintiff's admitted inability to work for more than two months establishes that she is not a "qualified

individual with a disability," the only people to whom the statute applies. *Byrne*, 328 F.3d at 380-81;
42 U.S.C. §§ 12111(8), 12112(a). Therefore, the discharge claim fails.

## Count IV - Retaliation Title VII and ADA

In Count IV of the fourth amended complaint, plaintiff asserts that Abbott retaliated against
her in violation of Title VII and the ADA by discharging her. Both statutes prohibit employers from
discriminating against an employee because she has opposed any act prohibited by the statute or
because she has made a charge of discrimination pursuant to it. 42 U.S.C. §§ 12203(a), 2000e-3(a).
Plaintiff relies on the direct method of proof to defeat Abbott's motion on these claims, which
requires her to offer evidence that she engaged in statutorily protected activity, suffered an adverse
employment action, and there was a causal connection between the two. *Tomanovich v. City of Ind.*,
457 F.3d 656, 663 (7th Cir. 2006).

There is no evidence that plaintiff made a complaint about disability discrimination or
otherwise opposed any act made unlawful by the ADA at any time before her termination. She has
not, therefore, raised a genuine issue for trial as to her ADA retaliation claim.

The situation is different for the Title VII retaliation claim, but the result is the same. It is
undisputed that plaintiff complained about Montgomery's alleged harassment in May 2001. (Pl.'s
LR 56.1(b)(3)(B) Stmt., ¶ 6.) It is also undisputed that Abbott terminated her in January 2002.
(Defs.' LR 56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 14, Letter from Ford to Hoang of 1/16/02.) There
is, however, no evidence that the two events have a causal connection.

On the contrary, it is undisputed that in the period between plaintiff's complaint and her
termination: (1) Acquasaliente, whom Hoang perceived as her nemesis from the Clari Group,

14

became Hoang's supervisor (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 10-11); (2) Hoang refused to attend one-on-one meetings with Acquasaliente, prompting him to contact Abbott human resources (*id.*); (3) Hoang had two meetings with Green, from Abbott human resources, and Wilson, Acquasaliente's boss, in which they offered her a transfer out of Acquasaliente's group (*id.* ¶¶ 15-17); (4) Hoang did not respond to the transfer offer and did not go to work after November 20, 2001 (*id.* ¶¶ 17-19); (5) Abbott sent Hoang numerous letters with instructions on how to apply for medical leave and benefits (*see* Def.'s LR 56.1(a) Stmt., Ex. 8, Hoang Dep. Ex. 12, Letter from Wilson to Hoang of 11/29/01; *id.*, Ex. 9, Hoang Dep. Ex. 27, Letter from Brock to Hoang of 11/30/01; *id.*, Hoang Dep. Ex. 28, Letter from Brock to Hoang of 12/10/01; *id.*, Hoang Dep. Ex. 29, Letter from Brock to Hoang of 12/18/01); (6) six weeks after her last day at work, Hoang sent Abbott a doctor's note that said she would be unable to work until mid-January 2002 (*id.*, Ex. 8, Hoang Dep. Ex. 16, Note from Mason to Human Resource of 12/10/01); and (7) on January 16, 2002, human resource representative Ford terminated Hoang's employment because of her extended absence from work without leave (*id.*, Ex. 8, Hoang Dep. Ex. 14, Letter from Ford to Hoang of 1/16/02; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 35.)[6] Because plaintiff has not raised a genuine issue as to whether her termination was causally related to her harassment complaint, Abbott is entitled to summary judgment on her Title VII retaliation claim.

**State claims**

In Counts VI and VII, plaintiff asserts against the individual defendants state-law claims for false imprisonment and intentional infliction of emotional distress. Having dismissed all of the

---

[6]See n.3.

15

federal claims, the Court declines to exercise supplemental jurisdiction over these state claims. *See* 28 U.S.C. § 1367(c)(3).

## <u>Conclusion</u>

For the reasons stated above, there is no genuine issue of material fact on plaintiff's federal claims and defendants are entitled to judgment on them as a matter of law. Their motion for summary judgment on Counts I-IV [doc. no. 119] is, therefore, granted. The Court declines to exercise supplemental jurisdiction over the state-law claims plaintiff asserts in Count VI and VII, which are dismissed without prejudice to refiling in state court. Because the Court did not rely on any of the contested submissions in deciding the summary judgment motion, defendants' motions to strike [doc. nos. 139 & 141] are stricken as moot. This case is hereby terminated.

**SO ORDERED.**                    **ENTERED:**    *9/28/07*


HON. RONALD A. GUZMAN
**United States District Judge**

16

# Exhibit J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DIEP X. HOANG, | ) | |
| | ) | No.: 03 C 2910 |
| Plaintiff, | ) | |
| | ) | |
| | ) | Judge: Ronald Guzman |
| vs. | ) | |
| | ) | Magistrate Judge: Schenkier |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| KATHERINE GREEN, KENNETH A. WILSON, | ) | |
| MAURIZO ACQUASALIENTE, and | ) | |
| STEPHEN MONGTOMERY | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF APPEAL

Now comes the Plaintiff, Diep X. Hoang and hereby gives notice of appeal to the Court of Appeals

from the judgment after an order granting a summary judgment motion of Judge Ronald Guzman

entered on September 28, 2007 and from each and every part thereof.

*Diep Hoang 1/25/08*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KC **FILED**

JAN 2 5 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | | |
|---|---|---|
| DIEP X. HOANG, | ) | |
| | ) | No.: 03 C 2910 |
| Plaintiff, | ) | |
| | ) | |
| | ) | Judge: Ronald Guzman |
| vs. | ) | |
| | ) | Magistrate Judge: Schenkier |
| | ) | |
| ABBOTT LABORATORIES, INC., | ) | |
| KATHERINE GREEN, KENNETH A. WILSON, | ) | |
| MAURIZO ACQUASALIENTE, and | ) | |
| STEPHEN MONGTOMERY | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING

To: Hubert O. Thompson
Ronald Austin, Jr.
Brothers & Thompson, P.C.
100 West Monroe Street, Suite 1700
Chicago, Illinois 60603

**PLEASE TAKE NOTE THAT** on the 25th day of January 2008, I filed with the Clerk of the

Court **NOTICE OF APPEAL**, a copy of which is attached and hereby served upon you.

_____
Diep X. Hoang
Plaintiff *pro se*

Diep X. Hoang
2454 W. Gunnison Street
Chicago, Illinois 60625
Telephone: 773-878-1208

## CERTIFICATE OF SERVICE

Diep X. Hoang, *pro se*, certifies that she caused a copy of **NOTICE OF APPEAL** to be served

on defendants via first class mail, postage pre-paid addressed as listed below on this 25th day of January,

2008.

> Hubert O. Thompson
> Ronald Austin, Jr.
> Brothers & Thompson, P.C.
> 100 West Monroe Street, Suite 1700
> Chicago, Illinois 60603

Diep X. Hoang
Plaintiff *pro se*

Diep X. Hoang
2454 W. Gunnison Street
Chicago, Illinois 60625
Telephone: 773-878-1208